UNITED STATES SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Patrick Delices<br>948 Longwood Avenue<br>Bronx, New York 10459<br><br>            Plaintiff,<br><br>v.<br>Board of Regents \| University of Wisconsin System<br>Office of General Council<br>1852 Van Hise Hall<br>1220 Linden Dr<br>Madison, WI 53706 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. _____<br>)<br>)<br><br>**17CV 8841** |

| | |
|---|---|
| University of Wisconsin-Milwaukee<br>Dr. Jeffrey Sommers<br>Associate Professor and Former Advisor<br>in his Official and Individual Capacities;<br>Dr. Anika Wilson<br>Chair, Department of Africology<br>in her Official and Individual Capacities;<br>Dr. Erin Winkler<br>Former Chair, Department of Africology<br>in her Official and Individual Capacities<br>Dean Marija Gajdardziska-Josifovska<br>in her Official and Individual Capacities<br>Johannes Britz<br>Chief Academic Officer/Provost<br>in his Official and Individual Capacities | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

                Defendants.

_____/

Mr. Patrick Delices
Pro Se

## COMPLAINT AND JURY DEMAND

This cause of action arises from Defendants' deliberately indifferent response age, race and sex discrimination on the premise of the University of Wisconsin Milwaukee. Defendants' singled out and subjected plaintiff to several adverse actions denial of teaching positions offered to female students, false complaints to deny federally funded grants, false charges of professional misconduct, failing plaintiff on preliminary exam, denying full grading results, not replacing

doctoral advisor after he removed himself because of complaints, leaving plaintiff in academic limbo by not assigning doctoral status.

This action alleges violations of Title VI and the denial of equal protection of the laws under the Fourteenth Amendment to the U.S. Constitution and violation of NYCHRL § 8-107.

Introduction

1. Patrick Delices proceeding Pro Se, brings this action pursuant to Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 stat. 252), to remedy acts of discrimination and retaliation perpetrated against her by Officials in the University of Wisconsin. He also brings Constitutional claims of violation of his Freedom of Speech, First Amendment and Fourteenth Amendment claims of deprivation of his Constitutional Rights and NYCHRL § 8-107..

Patrick Delices is a resident of Bronx, NY and attended the University of Wisconsin and discriminatory and retaliatory actions had an impact in New York City.

Plaintiff contends that University of Wisconsin Milwaukee officials discriminated against him by adverse actions after he and other students brought complaints about the department of Africology. Faculty in the department beginning with Dr. Jeffrey Sommers and then joining him discouraged his pursuit of a dissertation on his natural origin, failing him on his first preliminary examination as a way to end his academic career, denying him of an AOP Grant, denying him of an advisor, putting him in academic limbo because of his race (Haitian American) and natural origin (Haitian descent)

Plaintiff further asserts that University Officials retaliated against him for having complained about such discrimination, created a hostile working environment for him, caused her to suffer depression, failed to provide reasonable accommodation, failing to find remedies, forcing him to out of the University and finally leaving him in academic limbo based on the discrimination / retaliation.

Jurisdiction

1. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, which gives district court's jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

2. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of the civil rights.

3. This Court has jurisdiction over the subject matter of this civil action pursuant Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 stat. 252), (Pursuant to Title VI of the Civil Rights Act of 1964, the Restoration Act of 1987 and other nondiscrimination authorities. *Title VI* states that: No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. as more fully set forth herein.

4. Title VI – Retaliation - Title VI does not include an express provision prohibiting retaliation.1 Nonetheless, courts, including the Supreme Court, have held that various anti-discrimination statutes contain an implied cause of action for retaliation based on the general prohibition against intentional discrimination. See, e.g., Jackson, 544 U.S. at 173 ("Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action"). A statute that prohibits intentional discrimination implicitly prohibits acts of retaliation for complaints about or opposition to discrimination. See Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 237 (1969) (a prohibition on racial discrimination includes an implicit prohibition on retaliation against those who oppose the discrimination); CBOCS West, Inc. v. Humphries, 553 U.S. 442, 451 (2008) (a race discrimination statute encompasses retaliation actions as Congress and long line of precedent intended); Gomez-Perez v. Potter, 553 U.S. 474, 479 (2008) (ADEA federal-sector provision that prohibits age discrimination implicitly covers claims of retaliation for filing an age discrimination complaint); Peters, 327 F.3d at 318-19 (prohibition against retaliation is implicit in the text of Section 601 of Title VI).

5. First Amendment -This is also an action to redress the deprivation of Plaintiff's constitutional rights under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

6. Fourteenth Amendment -This is also an action to redress the deprivation of Plaintiff's constitutional rights under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

7. This court also has jurisdiction over NYCHRL § 8-107 when it is attached to Federal Discrimination Laws and has impact in New York City.

Venue

8. Venue is proper in this judicial district under Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 stat. 252); as Plaintiff is a doctoral student in the Africology Department of the University of Wisconsin Milwaukee at the time of the discriminatory and retaliatory actions. Though Plaintiff' student records are maintained by the University of Wisconsin, Milwaukee and decisions adverse to Plaintiff's employment that are the subject of this civil action were made in this judicial district of Wisconsin, the impact of the discrimination is felt in New York City. The Plaintiffs economics are impacted in New York City.

## Parties

9. Plaintiff, Patrick Delices, an African-Haitian male who is 46 years old and a citizen of the United States and a former resident of the State of Wisconsin during the adverse actions as a student. At all times relevant to this suit, until his denial of an AOP Grant that paid his tuition and the absence of an advisor which is necessary for continuation in the doctoral program. Patrick Delices is a student at the University of Wisconsin Milwaukee (UWM) that has completed his doctoral coursework and was on track to become dissertator status until the adverse and retaliatory actions.

10. Defendant the Board of Regents University System of Wisconsin. The Governing Body of the University of Wisconsin Milwaukee.

11. Defendant the University of Wisconsin Milwaukee (UWM) is the Institution that receives Federal Funding. See - https://uwm.edu/budget/uwms-budget-in-brief/

12. Defendant Jeffrey Sommers, is his former doctoral advisor in the Department of Africology at UWM. Dr. Sommers is being sued here in his official capacity only as a professor.

13. Defendant Anika Wilson is the current Chair of the Department of Africology at UWM. Dr. Wilson is being sued here in her official capacity only as a chairperson.

14. Defendant Erin Winkler is the former Chair of the Department of Africology at UWM Dr. Winkler Is being sued here in her official capacity of chairperson only.

15. Defendant Daniel McClure is a former professor at UWM's Department of Africology. Dr. McClure is being sued here in his official capacity of professor only.

16. Defendant Nolan Kopkin is a professor at UWM's Department of Africology. Dr. Kopkin is being sued here in his official capacity of professor only.

17. Defendant Marija Gajdardziska-Josifovska is the Dean of the Graduate School at UWM. Dr. Gajdardziska-Josifovska is being sued here in her official capacity as a dean only.

18. Defendant Johannes Britz is the Vice-President/Provost at UWM. Provost Britz is being sued only in his official capacity of Vice-President/Provost at UWM.

## Statement of Facts

19. Since 2013, I made repeated requests to teach a course in the Department of Africology. By 2015, I became aware that the female doctoral students who held the coveted teaching positions,

but they do not hold professional experience and qualifications equal to my professional experience and qualifications which include over seven years of experience teaching Black Studies at Hunter College of the City University of New York; publishing; overseas travel and research in Tanzania, Kenya, Egypt, Zanzibar, Algeria, Western Sahara's refugee camps, South Korea, China, Spain, Chile, Brazil, Dominican Republic, Cuba, and Haiti; serving as a research fellow for the late Pulitzer Prize historian Manning Marable at Columbia University; and working as a career services professional at numerous institutions of higher education. Moreover, unlike any other PhD student at the Department of Africology, I hold four graduate degrees (an MS.Ed., in Education Administration and Supervision from the City College of New York; an EdM in Higher Education Administration at Teachers College, Columbia University; an MBA in Quantitative Finance, Business Law, and Global Business from New York University, Stern School of Business; and an MPA in International Economic Policy and Management from Columbia University, School of International and Public Affairs).

20. I made Dr. Sommers aware of the above gender discrimination complaint.

21. In March 24, 2014, I was a member of a group of students who brought claims to the Department of Africology criticizing the expertise and experience of the faculty who did not have a PhD in African Studies. There were other issues, the chairperson at the time was Caucasian and faculty members were neither well-versed nor grounded in Africology theoretical and conceptual frameworks. These were concerns of the students and though I was not leader of the complaints; however, because of my expertise and maturity, many perceived me as the leader as I voiced many of the points in our grievance. The Africology faculty seemed upset about the concerns. However, students have a right to question the quality of instruction and the value of the degrees.

This complaint was never sent to EDS by Winkler or Faculty of Africology to cover up the complaint. My belief is that they singled me out as the leader and a trouble maker to begin discrimination against me.

**See Appendix 1 – *Letter Grievances and Solutions*.**

22. I claim that the ***Letter Grievances and Solutions*** document is a protected action.

23. Dr. Sommers knew of the letter because we talked about it. I guess he was trying to get information.

24. The PhD students in Africology got scared and deleted the copy of the complaint of concerns where it was listed online.

25. Since, I had made Dr. Sommers aware of a gender discrimination complaint, It might have seemed natural that I was an important voice in the students' complaint and a possible problem in the department.

26. On August 2014, Dr. Sommers and I began a very difficult exchange in which he wanted me to direct my work from Haiti to mass incarceration in Milwaukee. I told him that I came to this school to do work on either a *System Analysis of* the *Global Impact of the Haiti Revolution* or the *Political Economy of Haiti*: *From Slavery to Sovereignty*. He told me that there is nothing more to write about Haiti. I, being a Haitian, which is the natural origin of my family, culture, language, worldview, and expertise, strongly disagreed with Jeff Sommers and felt that the comment was racist. I told him that I knew of many Caucasian scholars writing about Haiti and Haitians were being marginalized from doing academic research and scholarly work on Haitian and not getting proper credit for their work. The very fact that I was helping Dr. Sommers write (co-author) a book that he had never finished years ago was a testament to this fact.

27. I believe my work in the students' complaint regarding the racial composition and the expertise of the faculty of Africology created a discriminatory animus. The bringing of the complaints to the faculty of Africology was a protected action.

28. Dr. Sommers attempted to change my doctoral dissertation topic. I believe that my disagreement with Dr. Sommers in terms of attempting to change my doctoral dissertation topic was the first discriminatory action.

29. I believe that Dr. Sommers took my disagreement with his racist views as not obeying his consultation or advice. However, his advice was discriminatory to me.

30. One week prior to September 20, 2014, Jeff Sommers asked for me to write an article regarding pro-Voting Rights and anti-Gov. Scott Walker of Wisconsin. The article was published on Sept. 20, 2014 in the *Milwaukee Journal Sentinel* as "Preserving the right to vote in the wake of Wisconsin's voter ID law." The link to the article is found at http://archive.jsonline.com/news/opinion/preserving-the-right-to-vote-in-the-wake-of-wisconsins-voter-id-law-b99353791z1-275847121.html/. This was out of my direct area of research and study, but I have written many articles on current events for the *Amsterdam News* in New York and other online media outlets.

31. Within a week of the article being published, Dr. Erin Winkler who was the chairperson of the Dept. of Africology at that time told me that people are calling her office and sending her emails requesting that I get kick out/expelled from UWM as a doctoral student. She also informed me that I had nothing to worry about as I expressed concerned for my academic trajectory as a doctoral student at UWM. Indeed, the comments online were disturbing as people called/emailed for her to expel me – now, these comments are no longer visible on the site. Thus, I feared for my life because obviously someone was

paying attention to me without warrant nor cause and Dr. Winkler said there were lots of calls and that this was a state that I did not know the politics of and there were very high incidents of racial prejudice against Black males. I believe that Dr. Erin Winkler actions of bringing up the matter were discriminatory and they scared me. I felt my life was being threatened.

32. I believe that the use of anonymous persons making complaints about me was the first usage of a tool that would be called later the whistleblower(s). This tool will be used against me within UWM and as it followed my academic and professional career. Several charges will plague my career and good name from unnamed people with influence making charges. I believe at this point there existed political discrimination and/or racial discrimination from someone very close to UWM and the Department of Africology who also had influence and power to begin investigations and remained unnamed and protected. My belief that the usage of an anonymous person yet to be named was a discriminatory tool.

33. Beginning in 2014, I had been working with Dr. Sommers as my doctoral advisor. Jeff Sommers not only sought me as his advisee, but he also immediately sought my expertise with a book about Haiti in which he needed assistance completing to be able to have it published. In exchange for my expertise and "co-authorship" (contributions).

34. Dr. Sommers wanted me to edit his work, including adding and updating facts and arguments, and write "chapters," (introduction and epilogue). I agreed to assist with the book, and began contributing under the assumption that the work on the book would not interfere with my progress towards the PhD in Africology.

35. By the Spring of 2015, with an overall GPA of 3.67, I completed all of the necessary coursework in Africology.

36. By the Spring of 2015, I completed sufficient coursework to be able to take my prelims and I engage in dissertation level coursework.

37. By June 28, 2015, Dr. Sommers approved my request to take the preliminary exam, confirmed a bibliography for the exam of about 55 books on Haiti, and sent me the exam question. The topic was essentially the history and political economy of Haiti from colonialism to independence to Haiti's present state which is basically related to the book "chapters" (introduction and epilogue) that I wrote.

38. At that time, Dr. Sommers did not provide a date to sit for the exam, which is required prior to the test's commencement. Throughout the summer of 2015, I repeatedly spoke with Dr. Sommers and requested a preliminary exam date. Instead, Dr. Sommers steered the conversation to the completion of the work for the book. I believe that this was discriminatory.

39. As Dr. Sommers was my academic advisor with discretionary power over approval of my dissertator status, I felt compelled to complete the extracurricular work for the book without complain. I also felt that something was wrong in that he delaying my prelim exam for the completion of the book. I felt Dr. Sommers was discriminating against me but had to finish the work.

40. In 2015, during that summer, I submitted my curriculum vitae to Dr. Sommers and discussed gender disparity regarding teaching courses in Africology again. This was a protected action.

41. I made a complaint to him again about gender discrimination regarding that matter.

42. In August 18th and August 25th – Dr. Winkler and Dr. Sommers discussed my work. They discussed the credits that I need to take, they discussed my taking the dissertation class.

    Dr. Winkler wrote the following on August 24th 2015:

    Dear Jeff,

    I don't think the two different 799s should be a problem, but they would have to be with different faculty (a student cannot sign up for the same course twice in one semester, which your section of 799 would be). Also, there would have to be 799 paperwork for each justifying the 3 credits, so there would have to be documentation that each would require 3 credit hours' worth of work for the Fall 2015 semester. Alternately, one of the 799s could be taken for only two credits.

    It seems like it would make the most sense for another member of the dissertation committee to be the instructor of record on one of the 799s.

    I hope this helps,
    Erin

    See Appendix 2 – Sommers/Winkler Correspondence

43. By the Fall of 2015, Dr. Sommers still had not provided me with a preliminary exam date nor did he assign me the 799 courses. Instead, he inexplicably changed the topic of the preliminary exam to include theories of imperialism and added a second bibliography – this one on imperialism. Dr. Sommers also changed sporadically the selected documents (the two bibliographies on numerous occasions as late as December of 2015 – take note that my prelim exam was set for January 4, 2016). The number of publications ultimately selected for me ballooned from about 55 in June of 2015 to 117 by December of 2015. My understanding after conversations with other students is that other doctoral students in the

program with approved bibliographies were required to review about 30 - 40 publications and had one bibliography not two. I felt that Dr. Sommers was retaliating against me for the protected actions of being part of the students that brought the complaint and complaining about the teaching positions.

44. Given the vast difference in approved bibliography lengths and the timing of the bibliography and the topic modification within a short period of time, I claim now that this was retaliation. Moreover, I claim retaliation because other students were not subject to this type of exam variance and disparity in the Dept., of Africology.

45. I claim that this was retaliation because Dr. Sommers policy on providing me with two bibliographies was different procedure than with other students and I claim that his motive was punishment for my complaints and that did not want me to be an expert (scholar/intellectual) on Haiti, the place of my natural origins.

46. I also claimed that the actions were close in proximity to the original student protected action, to the complaints about teaching, to the Dr. Sommers trying to change my doctoral work and my complaint and resistance.

47. During the summer of 2015, when the book (*Race, Reality, and Realpolitik: U.S. –Haiti Relations in the Lead Up to the 1915 Occupation*) which I contributed to was set for a November 2015 publication date, Dr. Sommers abruptly and unfairly altered the topic of my preliminary exam which was strictly on Haiti to the theories of imperialism. I complained to him.

48. I claim that this was further retaliation to prevent me from becoming a documented expert on my natural origins and but for the previous complaints.

49. I disagreed and complained about the sudden change and voiced my concerns to Dr. Sommers regarding this sudden change, but he insisted that I focus on the theories of imperialism. Dr. Sommers was very uncomfortable with my concerns and complaint.

50. I claim that Dr. Sommers attempt to change the focus of my exam to the theories of imperialism was retaliatory based on my earlier complaints. I had done no major course work on the theories of imperialism and my academic focus was on the political economy of Haiti with a specific focus on slavery, colonialism, the Haitian Revolution, decolonization and decoloniality. As a matter of fact, I spent two consecutive summers (the Summers of 2014 and 2015) in Spain studying theories on colonialism and decolonialism/decolonization and decoloniality.

51. As a result, unlike other doctoral students in the Department of Africology, the disparate treatment is illustrated by the fact that I had two bibliographies: one on Haiti and the other on imperialism. Dr. Sommers kept changing the bibliographies as late as December of 2015 and I was scheduled to take the preliminary exam on January 4, 2016 with a reading

list of over 100 books. It must be noted that I requested repeatedly to take the preliminary exam since the spring/summer of 2015 and at that time, only one bibliography existed for the main topic of agreement, which was on Haiti not the theories of imperialism.

52. I claim here that Dr. Sommers's actions were based on retaliation for me asserting my protected actions in the form complaining about him and Jeff Sommers preventing me from being an expert in my natural origins.

53. Any comments by Dr. Sommers against my abilities must be pretextual for it must be noted that the exam reflected the work that I have completed in writing the introduction and conclusion of our book that was published by November 2015.

54. By August of 2015, UWM sent me a letter stating my federally funded AOP fellowship of $15,000 per academic year was being rescinded because a "whistleblower" advised UWM officials that I was employed at 4T's, a non-profit in NYC. UWM officials stated that part of the basis for their belief that I was working in NYC was a posting on a website for 4Ts where the employer failed to update a past voluntary post that I held there many years ago before embarking to UWM. Upon my provision of proof, including a signed, notarized letter from the founder/alleged employer - 4Ts., the denial of my AOP fellowship was overturned. It is my belief that this was retaliation for my protected actions.

55. However, UWM never revealed to me who the whistleblower was. I repeatedly asked who is the whistleblower so I could defend myself. I believe the University was using a John/Jane Doe to begin a process of retaliation against me.

56. I claim not letting me know who was the whistleblower in the proceedings was retaliation to keep me from defending myself. I should know my accusers. I requested this to defend myself and not giving it to me was retaliation.

57. It is my belief that the whistleblower is a member of the Department who is discriminating against me and the University's position of shielding that person from me and the exact statement showed a retaliatory animus of the University. Whoever made the complaint had access to my resume or vitae.

58. The University resolved the matter regarding the AOP fellowship in my favor. However, I claimed and maintained that the entire matter was retaliatory action against me by the University.

59. UWM reinstituted the fellowship for the 2015-2016 academic year.

60. On December 18, 2015, I requested for Dr. Sommers to approve my renewal of the AOP fellowship for the academic year 2016-2017. And he replied, "I discussed the AOP issue with our graduate faculty. Given the problems that surfaced this past year, it was decided

another year's AOP support can't be tendered". I questioned and complained how this decision was made, and who determined what "problems" warranted the termination.

61. The Advanced Opportunity Program (AOP) fellowship is funded by the State of Wisconsin. The AOP fellowship provided me with health care and was my main source of financial assistance. AOP fellowships are designed to assist members of groups under-represented in graduate study, and other disadvantaged students, to enter and complete a graduate degree at UWM. Awards are granted to newly admitted or currently enrolled UWM graduate students. AOP fellowships are renewable for up to two years for master's students and three years for doctoral students and students enrolled in a terminal master's program. Renewal is contingent on meeting course and program requirements and level of academic progress toward degree as determined by each fellow's advisor. No student may qualify for more than three years of combined support in their master's and doctoral studies. See http://uwm.edu/graduateschool/aop-guidelines/ for periods 2013 to 2016.

62. I claim that Dr. Sommers acting as my academic advisor retaliated against me for my protected actions by not wanting to sign off and approve my AOP fellowship. A prerequisite was that the academic advisor signs off/approve the AOP fellowship and he would not. I claim his action was retaliation for my previous protected actions and for winning against the earlier denial of my AOP fellowship. This was part of another try of retaliation.

63. I claim that the rescission of the AOP fellowship for 2016-2017 was retaliatory and involved several people in addition to Dr. Sommers.

64. I claim that Dean Marija Gajdardziska-Josifovska participated in this retaliatory action. In addition, instead of having a non-partial AOP Committee, Dean Marija Gajdardziska-Josifovska managed the process as it pertained to me and made decisions about granting and denying the AOP particular to me. I claim that I never received a grant letter of denial from the committee during the time when other applicants were receiving grant/denial letters. At that time, I never knew the real reason for my denial. All of these actions were retaliation for my protected actions by Dr. Sommers and the Dean and possibly the Africology Chairperson(s) either Dr. Erin Winkler or Dr. Anika Wilson or both. I will later in this complaint impeach their non-discriminatory rationale for denying me the AOP.

65. Dr. Sommers in his denial letter to me regarding the AOP denial said that he spoke to the graduate faculty and that the AOP could not be tendered. The Department Chair and Dean Marija Gajdardziska-Josifovska would have been individuals that he spoke to. The letter that he wrote is direct evidence that he spoke to people in the Graduate Committee that could make such a decision.

66. I claim that their actions were designed to prevent me for having the necessary funds for continuing my academic work and thus retaliation.

67. By September 2015, I got a notice that the University was investigating me for Professional Misconduct. The University said that after a tip from a whistleblower indicated that in several videos, newspapers, I referred to myself a Dr. or Professor.

68. During the investigation, I told the Anika Wilson who was heading the investigation that I felt singled out like Trayvon Martin and asked her, specifically what did I do – what university policy have I violated and what laws have I obstructed. And she said none. I also expressed to her that I felt that they were trying to force me out of the University.

69. In November 24, 2015, Drs. Anika Wilson, Daniel McClure, Nolan Kopkin, and the University accused me without due process of professional misconduct/misrepresentation.

70. I was not a faculty member, I was a student. I claim that the charge was retaliation for my protected actions as it proved to be another scheme of the University and its professors in Africology along with the Dean participated in retaliation.

71. I also claim that this was a violation of my First Amendment Right. I was formerly an adjunct professor that taught for Hunter College in the African and Puerto Rican Studies Department of Hunter College. I have a right to call myself professor as long as I state where I taught from.

72. I also claim that professor is a term in Haitian Creole, my natural origin of Haiti, for teacher and it is in my culture to use this word as it does not always apply to academia / higher education. Nevertheless, I claim this is a violation of my free speech.

73. The charge never went away as the committee had sent a letter to various members of the Department about their actions and charge. I claim that purpose of this was to defame my character and to prevent professors and staff from associating with me. I claim that their action was defamation of my character / good name.

74.

75. The University sent me a letter saying that other faculty members were notified. I claim that this was retaliation and a tool to harm me academically. It was a retaliation tool to create a hostile educational environment.

76. I also claim their actions of this charge was retaliation for my protected actions and that one adverse came directly after another to break my spirit as I prepared for the preliminary exam.

77. In January 4, 2016, I was afforded the opportunity to take my prelim and submit the exam within a week by its due date January 11, 2016, which ironically was my 45th birthday. Dr.

Sommers issued a failing grade on the exam and wrote "passing this prelim exam will take much work (reading or re-reading) in order to better see the intersection between Haiti's development through the prism of theories of economic development and imperialism. I have to be honest and state that it will be a steep climb to gain mastery, or even general competence, of these topics."Dr. Sommers' email failed to mention that the incorporation of the theories of economic development was not part of the exam preparation – Dr. Sommers did not request for me to focus on the theories of economic development for this preliminary exam and interestingly, the other two committee members (Drs. George Bargainer and Harwood McClerking) were not copied on his exam question.

78. I claim that Dr. Sommers's comments were adverse actions of retaliation. He had earlier denied my AOP and was now trying to end my academic career.

79. This action is but for my protected complaints and for winning the first AOP denial and came as a continuous process of close adverse actions and complaints.

80. To date, no other committee members (Drs. George Bargainer and Harwood McClerking) offered any feedback regarding this exam. My understanding is that it is highly unusual for committee members to remain silent regarding their opinion of such an important examination, for if a student "so clearly missed the mark," professors generally offer tips to improve the quality of the student's work. Finally, the language of the email quoted is chilling and shows a predisposition of Dr. Sommers to fail me, regardless of the quality of any future work submitted.

81. I claim here that Dr. Sommers actions of failing me and not providing complete feedback on my exam was retaliation for me asserting my protected actions of complaining about him preventing me from being an expert in my natural origin of Haiti.

82. I made several requests for a complete feedback on my exam and Dr. Sommers never complied with the feedback. I claim that not providing me with the feedback of the other professors showed that he was the agent of adverse discrimination and of failing me on the exam. He also was attempting to cover up what he had done.

83. I claim that the actions of Dr. Sommers - not signing off on my AOP Fellowship and now failing me on the preliminary exam were connected, concerted actions of discrimination and retaliation.

84. On Feb. 29, 2016—I made a Complaint to the Federal Office of Civil Rights (OCR) about my complaints to the University. See Appendix 3, Exhibits 1 -12 – First OCR Complaint.

85. By May of 2016, I took the prelim exam again, and I passed; even though, my essay/answer for the first exam was similar, but not identical to my essay/answer on the second prelim exam.

86. The OCR complaint was dismissed because of a lack of response. I did not receive a notice that they sent me and was not able to respond on time. OCR gave me the opportunity to resubmit the complaint or work internally. I decided to give the University my complaints through its EDS department.

87. I made formal complaints to the University beginning May 2, 2016 to the Universities EDS Office on all occurrences of discrimination on John/Jane Doe (the "first whistle-blower of the AOP investigation"), John/Jane Doe (the "second whistle-blower of the Professional Misconduct investigation"), Dr. Jefferey Sommers, Dr. Erin Winkler, Dr. Anika Wilson, Dr. Nolan Kopkin, Dr. Daniel McClure, John/Jane Doe (the "whistle-blower") and Dean Marija Gajdardziska-Josifovska. These complaints were composed of complaints that I made individually, to investigatory committees.

88. The complaints to the EDS are called EDS 16-0111 a-e (See Appendix 4). The EDS department gave me directions to make the complaint to each individual. I complied, however, the individuals were largely working together in some capacity and I had to tell the story over again in each complaint.

89. After receiving each of the notices / reports by EDS, I responded and rejected them from October 31, 2016 to January 2017. I responded and rebutted them. These constitute protected actions. These documents are illustrated in Appendix 5 – EDS notices and rebuttals.

90. The summer of 2016, Dr. Sommers wrote that he is no long advising me. By August of 2016, I contacted Dr. Wilson who informed me that she was unaware that Dr. Sommers was no longer my advisor. I claim that this was retaliation for my protected actions.

91. Upon knowing this fact, Dr. Wilson did not take any actions to ensure that Dr. Sommers completed all of the work pending including completing the doctoral milestone application form. The completion of the doctoral milestone application form would allow me to continue to the next step of the dissertation processes. Prior to electing not to serve as my advisor, Dr. Sommers did not complete his obligations as an advisor by checking off/completing my doctoral milestone form. The milestone had been pending since April 28, 2015.

92. I followed up by contacting Shane A Haensgen, doctoral retention advisor at UWM's Graduate School, to see if I was officially dissertator status for this semester. An email exchange involving various parties (Patrick Delices, Shane A Haensgen, Dr. Wilson, Dr. Sommers, and Dr. Mbalia) ensued. At one point, Dr. Sommers claimed that he never "advised" me on filing out the milestone/doctoral dissertation summary and to avoid liability, he later stated that he "advised" me to complete the milestone/doctoral

dissertation prospectus, even though he was not sure about the foreign language requirement and kept changing my proposed dissertation topic several times.

93. The inability to resolve this multi-party conversation and the inability for the chair to intervene, I claim as retaliation for this non-action which placed me in academic limbo.

94. Once Dr. Wilson had knowledge of Dr. Sommers's decision to step down as my doctoral advisor, she did not secure a doctoral dissertation advisor and assist with the formation of a doctoral dissertation committee on my behalf.

95. I claim her actions are adverse and are retaliatory for my protected actions in the form of complaints against her.

96. Not having an advisor and not having the dissertator milestone form filled out and not having an advisor caused me to begin taking the semesters off while I wait for remedies. The harm has been indefinite academic limbo.

97. Dr. Anika Wilson a relatively new chair and Dr. Sommers take it upon themselves to point to some words about the dissertator status in the Graduate Handbook. From the document that they pointed to there is no working that a doctoral student must complete a dissertation prospectus and/or have a dissertation committee to achieve dissertator status. However, it does state that a doctoral student needs a dissertator advisor and committee to proceed in regard to the dissertation prospectus not dissertator status.

98. Nevertheless, their argument is pretextual for they were supposed to get the Dean involved or the Dean was supposed to be already involved which she was not – not to my knowledge.

99. In addition, the process was unusual for Dr. Sommers never followed up earlier with Shane A Haensgen, doctoral retention advisor.

100. Dr. Sommers and Dr. Wilson's actions harmed my progress toward a PhD and are retaliatory.

101. I claim that Dr. Jeffrey Sommers, Dr. Anika Wilson's non-actions, along with Dean Marija Gajdardziska-Josifovska actions are responsible for forcing me to take leave and these are retaliatory actions based on my protected actions.

102. As of May 2016, I have been left in academic limbo and without an academic advisor (permanent or temporary) which has prevented me from continuing my academic work towards my doctoral dissertation on Haiti, the place of my natural origin. Moreover, it has prevented me from obtaining funding to continue my academic work.

103. I have made repeated requested to Dr. Anika Wilson, the Chair of Africology, about this matter with her only response that it is my job to secure an advisor. I have written several faculty members and received no answer. I asked Dr. Anika Wilson to intervene with no

success. I have repeatedly asked Dr. Wilson to intervene on my behalf to secure a doctoral advisor and committee for me (See Appendix 6 & Appendix 7) given the fact that it has been over one month since I made a request to Dr. McClerking to serve as my doctoral dissertation advisor in addition to having Dr. Gelan to serve in my doctoral dissertation committee (See Appendix 6 & Appendix 7). I asked Dr. Wilson to reach out to Dr. McClerking on my behalf to see if he would agree to serve as my advisor. Instead of cooperation or assistance, Dr. Wilson informed me that UWM professors are not "on contract" during summer months, and never answered my query as to whether or not she actually reached out to him. Thus, due to her lack of action, I can see no reason for her indolence except for retaliation. Moreover, by exploiting the fact that Dr. Sommers is no longer "advising" me, the electronic correspondences clearly show that Dr. Sommers along with Dr. Wilson should have completed/closed out pending issues regarding my milestone given the fact that Drs. Wilson and Sommers are obligated to do so. According to Shane A Haensgen, as of September 7, 2016, Dr. Sommers is listed as my "advisor" and Dr. Wilson is listed as the "Grad. Rep" and only Dr. Sommers could check off that I met all the requirements and only Dr. Wilson can approve what Dr. Sommers checked off (See Appendix 6 & Appendix 7). For them to do so, would change my academic standing at UWM to dissertator, but they refused to do so because of retaliation. As such, Drs. Wilson and Sommers are exploiting this situation by not taking ownership to move this matter along as it is their obligation to do so and in spite of the fact that Shane A Haensgen indicated that they need to sign off the milestone so I can become a dissertator status."

104. According to the letter sent by Erin Winkler to Dr. Jeffries (See Appendix 2), I had a dissertation committee before the prelim exam. In addition, those who graded my exam were of my dissertation committee. Dr. Wilson could have assigned a person from the committee and I would have accepted that person or not. Her actions of not providing me an academic advisor and placed me in academic limbo and are pretextual and retaliation.

105. Dr. Anika Wilson and Dr. Sommers's actions knowing that I had a protected action on them and not seeking unbiased expertise is retaliation for my protected actions and would dissuade anyone from complaining about discrimination or retaliation.

106. Now, out of the University, I am not eligible for academic funding and health benefits at UWM as a doctoral student. They caused this situation. I have never taken time off prior to this and was ahead of my cohort = actually, I was the last member of my cohort as the other two students dropped out of the doctoral program in Africology. I am claiming that this adverse situation is retaliation.

107. Dean Marija Gajdardziska-Josifovska has the direct oversight of the Department of Africology and is obviously aware of the circumstance through the various complaints and has not intervened in the matter.

108. VP/Provost Britz, who oversees the Dean, through the various EDS complaints / reports along with OCR complains, has not intervened in the matter.

109. I claim that Provost Britz, Dean Marija Gajdardziska-Josifovska, Dr. Anika Wilson, and Dr. Jeffery Sommers with intent purposely placed me in academic limbo as retaliation for my protected actions.

110. Beginning October 31, 2016, I appealed and rejected a series of EDS reports this report largely delayed with my discrimination complaints about Erin Winkler and discrimination of teaching positions to males. This was Complaint NO: 16-011 (A).

111. In my response I said, "I reject the findings/conclusion of EDS and I am appealing its report regarding Complaint NO: 16-011 (A) based on the following eight grounds: Feedback from male doctoral students was not included in this report which goes back to my original discrimination complaint – there is no equal opportunity in positioning/placing male doctoral students to teach a course, not simply as a TA. The report by EDS never mentioned whether or not male doctoral students were interviewed for this particular complaint/report. And if they were interviewed for this particular complaint, what was their response? All the witnesses were female doctoral students who had the opportunity to teach a course in the Department of Africology - EDS only interviewed female doctoral students - thus, making this decision susceptible to bias. One must therefore ask, where are the male doctoral students who are not TAs, but taught a course in the Department of Africology – do they exist? If not, why not? And if so, why were they excluded from being interviewed regarding this extremely important sensitive matter? Therefore, I am requesting that male doctoral students in the Department of Africology to be interviewed regarding this matter. There is no reason that UWM or EDS can give for not interviewing male doctoral students in the Department of Africology regarding this particular complaint.

112. My discriminatory complaint is about male doctoral students teaching a course not about male doctoral students being a TA. My discrimination complaint was about teaching positions. The University has never answered this claim. And is attempting to hide its adverse action of denying Male Students with experience the privilege of teaching as it did with female students.

113. Dr. Erin Winkler never correct, clarified or rectified the matter. I assert after the University has given its answer through the EDS procedure that Dr. Erin Winkler's actions was gender discrimination.

114. The University has never gave an explanation regarding Dr. Jeffrey Sommers non-actions after I made the complaint of gender discrimination on numerous occasions during 2015 as we were writing/working on his book I reassert the claim that Dr. Jeffrey Sommers non-actions were discriminatory and he knew I engaged in a protected action.

115. In Complaint No: 16-011(F) concerning Respondent: Dr. Marija Gajdardziska-Josifovska on December 29, 2016, the Equity/Diversity Services Investigation Report showed a letter from Dr. Sommers that said this, "Hi [Complainant], I discussed the AOP issue with our graduate faculty. Given the problems that surfaced this past year, it was decided another year's AOP support can't be tendered. I'm sorry about that".

116. In this letter, Dr. Sommers let me know that the Graduate Faculty by discussion would not award me the AOP fellowship. This denial by group would happen before any of the pretextual statements from Sommers, and Dean Dr. Gajdardziska-Josifovska regarding the denial.

117. I submit this report as direct evidence of retaliation by Sommers, the Dean Dr. Marija Gajdardziska-Josifovska, Dr. Anika Wilson. This discussion about denying me was after my protected actions of the first OCR complaint and during the EDS complaint. Both Sommers and Wilson were individuals that I complained of and Sommers here is saying that he initiated the discussion.

118. In Complaint No: 16-011(F) concerning Respondent: Dr. Marija Gajdardziska-Josifovska on December 29, 2016, by the Equity/Diversity Services Investigation Report, the pretextual denial letter is looked at. There own words - Approximately ten days after filing his complaint with EDS, on May 9, 2016, the Complainant received a letter from the Respondent, which informed the Complainant that his AOP Fellowship would not be renewed for the 2016-17 academic year. In relevant part, the Respondent's letter read: The Graduate School has reviewed your application to renew your Advanced Opportunity Fellowship award. We regret to tell you that the award will not be renewed for academic year 2016-17. AOP award recipients are required to carry and complete a full load of 8-12 graduate credits per semester during the academic year, and to demonstrate satisfactory progress toward their degree. These terms were clearly communicated to you in an email on March 14, 2014...when the initial award offer was made. They are also explicitly outlined in the AOP recipient handbook, as well as the award acceptance letters signed by you on March 17, 2014 and on March 31, 2015. During the current 2015-2016 award year, you failed to maintain compliance with these award requirements. A review of your transcript shows that in fall 2015, you enrolled in nine credits taken for credit/no-credit. The Graduate School website...advises all graduate students, "You may not register for a course on a credit/no credit basis, except when a course is offered only for credit/no credit." Your semester GPA was calculated at 0.0 and did not contribute to maintaining a satisfactory GPA. The credits earned cannot count toward your degree, and cannot demonstrate your satisfactory progress. During the current semester [that is, the Spring 2016 semester], you enrolled for only three credits, again on a credit/non-credit basis. Therefore, in spring 2016, you not only failed to take graded coursework appropriate to a graduate student, but also failed to maintain the required course load. We note that the

courses for which you enrolled this year (all U/G courses at the 300-500 level) did not follow the plan of study for intended coursework which you submitted for your previous award renewal, which specified more advanced options at the 600-900 level. These circumstances all suggest reason for pause regarding the renewal of a fellowship that is awarded competitively on the basis of academic merit. In addition, the Graduate School requires initial nomination for the AOP award by the graduate program, which you received, and continued annual support from the program for renewal of the award. Your application for AOP award renewal in 2016-2017 was not supported by your program. Accordingly, your current AOP Fellowship is determined to not be renewable....

119. I submit this whole letter – (See Appendix 6 & Appendix 7) as direct evidence of pretext and retaliation. The EDS investigation unit says that the letter was written 10 days after I submitted my EDS complaint. I only got this letter after I complained about the process and not receiving my letter of acceptance or denial when others received theirs.

120. This letter is also direct evidence of retaliation for the following reasons, I had completed all of my coursework in the Summer of 2015 and my GPA was already calculated at 3.67. I was taking extra classes to fulfill enrollment purposes. I chose credit or non-credit courses only for enrollment. Here the Dean's statement is pretextual in that she said she looked at my transcript but if she did she would have known that my GPA was 3.67 and that I completed my coursework for the program in a record year and half in the program. Her statements about GPA and Credit fall flat on its face and are direct evidence of retaliation. In addition, she was one of the people in the Graduate Program that Sommers must have talked to when he initially denied me before I even put in the application.

121. In the same investigatory letter, the following was rendered from the Dean Dr. Marija Gajdardziska-Josifovska "She explained that she first became aware that the Complainant had filed a complaint with EDS when she was copied on an email that the Complainant sent to the Provost on May 23, 2016. In the email, the Complainant voiced concerns about the Doctoral Advisor continuing to serve as the chair of his preliminary examination committee. The Respondent indicated that she had not discussed the complaint the Complainant filed with EDS with any of the faculty members in the Department of Africology. The Respondent stated she had been informed in March 2016 that the Complainant had filed a discrimination complaint "at the federal level" (that is, with the OCR) that concerned the denial of his AOP Fellowship. However, she denied that the Complainant's filing of a complaint with the OCR had any effect on her decision not to renew the Complainant's AOP Fellowship. She stated that the Complainant's application was considered in the same way as any other student who requests renewal of their award: by reviewing the applicant's transcripts to determine their academic status and progress, and by assessing whether the applicant has the support of their program in their request for renewal. She reiterated that the Complainant's application, and the subsequent review conducted by the Graduate School, failed to satisfy both of these criteria. For this reason, the Complainant's request for renewal was denied.

122. I submit this as direct evidence of retaliation for she does not mention that Sommers had proffered in his letter that he met with several members of the Graduate Committee and it was decided that his AOP fellowship could not be continued. Here she knows about the protected actions. She knows that Dr. Sommers and Dr. Wilson are being charged with discrimination, yet she says that she did not talk about the complaints.

123. Also in the letter, the statement from EDS, that "She stated that the Complainant's application was considered in the same way as any other student who requests renewal of their award: by reviewing the applicant's transcripts to determine their academic status and progress, and by assessing whether the applicant has the support of their program in their request for renewal. She reiterated that the Complainant's application, and the subsequent review conducted by the Graduate School, failed to satisfy both of these criteria. For this reason, the Complainant's request for renewal was denied.", is direct evidence of retaliation for Dr. Sommers had already ahead of the process spoke to members of the graduate committee by his statement to deny him. The Dean in the letter also knew of the complaints. Thus, my complaint was not handled the same as other statements and this letter shows not only pretext but retaliation by the Dean Marija Gajdardziska-Josifovska and by Dr. Sommers. This type of process would dissuade a reasonable person from complaining about discrimination.

124. I further submit that the Associate Dean's statements show Dr. Sommers' retaliatorily actions. The Associate Dean said the following, "The Associate Dean explained that one of her primary duties in the AOP Fellowship application process is reviewing applications which are "incomplete." The Associate Dean indicated that the Complainant's application for renewal of his fellowship for the 2016-17 academic year was one such "incomplete" application. She recalled that the Complainant's advisor had not "checked off the box" on the application form indicating that he (the Doctoral Advisor) was recommending renewal of the fellowship, and that the area of the form documenting the Complainant's academic status was left blank. As a result, the Associate Dean stated she had to "chase down" the Doctoral Advisor to receive an explanation as to why he was not recommending renewal of the Complainant's fellowship. By this point, the February 5 deadline for advisors to submit renewal requests had passed, and the Doctoral Advisor was therefore "locked out" of the online application system. As such, the Doctoral Advisor was required to provide "an email or letter" explaining his rationale for not recommending renewal of the Complainant's AOP award. On March 28, 2016, the Doctoral Advisor forwarded an email from one of his colleagues in Africology who reported to the Doctoral Advisor "the difficulty [she] encountered with [the Complainant];" this email is described in greater detail on page 17 of this report. Subsequently, on March 30, 2016, the Doctoral Advisor submitted his own letter detailing his concerns about the Complainant's performance in the Doctoral Program in Africology; this letter is described more fully at pages 10-11 of this report."

125. Here, Dr. Sommers did not complete the application and had to be chased down for an explanation. This is direct evidence of retaliation.

126. Dr. Sommer's explanation for not recommending in the same report is the following, "Ultimately, on March 30, 2016, the Doctoral Advisor submitted a letter to the Graduate School explaining his rationale for not recommending renewal of the AOP Fellowship. In that letter, the Doctoral Advisor wrote (in relevant part): [The Complainant] has had 4 grades in the "B" range (Africology 880, 701, 814 and another 880) in our program, including a B-. At the doctoral level, the expectation is for A level performance. Moreover, [the Complainant] had incompletes, which he completed. This in itself is not inherently problematic, but the faculty involved complained that work was done to a low standard Page and not delivered when promised… Thus, we have a student who last academic year was frequently absent, performed at a subpar level academically, routinely inconvenienced our faculty and who by unanimous decision of his prelim committee, failed (badly) his prelim exam. Given the above academic performance and related problems, the assessment of our graduate faculty, including myself as [the Complainant's] advisor, is that another year's AOP funding is not warranted."

127. Dr. Daniel McClure said I was subpar academically; even though, I had a 3.67 GPA. Dr. Sommers stated that my academic performance was declining; even though, I completed all my doctoral coursework in Africology within 1. 5 years, unprecedented and unlike any other doctoral student, with a 3.67 GPA. See Appendix 11 – Academic Transcript and Progress Report.

128. Jeff Sommers and other faculty members stated that I was not making academic progress toward my degree and I was subpar is proven to be false, pretextual, discriminatory, and retaliatory given the fact that on August 18, 2015, Jeff Sommers to an email to Erin Winkler, the chairperson of Africology at that time, stated for the Fall 2015 semester Patrick Delices "needs to take 8 or 9 credits to maintain his AOP, but he has fulfilled his course requirements for our program."

129. On that same email to Erin Winkler on Aug. 18, 2015, Jeff Sommers asked her "can he take 3 credits of Africology 325 and then 3 of 799 for Prelim prep and another 3 of 799 for Doctoral Dissertation Prospectus prep for a total of 9?"

130. On August 24, 2015 letter, Erin Winkler replied to Jeff Sommers and stated:

"I don't think the two different 799s should be a problem, but they would have to be with different faculty (a student cannot sign up for the same course twice in one semester, which your section of 799 would be). Also, there would have to be 799 paperwork for each justifying the 3 credits, so there would have to be documentation that each would require 3 credit hours' worth of work for the Fall 2015 semester. Alternately, one of the 799s could be taken for only two credits.

It seems like it would make the most sense for another member of the dissertation committee to be the instructor of record on one of the 799s."

131. The email exchange between Sommers and Winkler clearly proves that I am not subpar; successfully made academic progress toward my PhD and being dissertator status; completed all of my coursework for Africology; was ready to take a dissertation course; had a dissertation committee; and had no problem with my renewed AOP fellowship until December of 2015, when Jeff Sommers did not want it to be renewed.

132. I claim that there are many instances that the EDS and those handling my OCR complaint were retaliatory in that they those interviewed did not state that they were notified by EDS or those handling my OCR complaint for instructions on non-retaliatory actions toward me. They seem to make their own decisions.

133. I claim that the EDS and those handling my OCR complaint were retaliatory in that there were many contradictions and separate statements, yet the University did not re-interview the respondents.

134. Provost Britz is the chief academic officer of the University of Wisconsin Madison. The Provost issued all final reports after I rebutted each and every final report.  See Appendix 8 – Final Reports & Rebuttals A-F.

135. The EDS reports come after I initially filed the first OCR complaint - Here the University was notified of my protected actions.

136. The Final Reports come after the EDS reports, Rebuttals A-F. Each and every report and rebuttal were protected actions.

137. Provost Britz listed no remedies for the matters, and his reports stand as the Universities voice on its non-discriminatory and non-retaliatory and non-defamation of character final decision on my matter.

138. As of Jan. 1, 2016, I had completed the following actions and simply need an academic Advisor to continue and Provost Britz non actions of keeping me out of the University is but for my protected actions.

    a. Completed all major and minor course requirements.
    b. Passed the doctoral preliminary examination.
    c. Submitted a dissertation topic summary or proposal hearing form to the Graduate school.
    d. Met residence requirements.
    e. Cleared incomplete and "progress" grades/reports in non-research courses.
    f. Achieved a 3.0 or higher cumulative GPA.
    g. Completed the language requirement (if required).

    h.  Completed other departmental requirements (if any).

139. On March 27, 2017, I amended my OCR Complaint to file Retaliation against the Provost.

140. It is in these documents I add new charges of retaliation and then ultimately charge the Provost for retaliation for not providing any remedies and for rubber-stamping the reports. See Appendix 9 & Appendix 10 – Second OCR Amended Complaint.

141. Provost Britz is not an expert on discrimination and retaliation law. He has no training listed in any of the EDS reports and his professional vitae.

142. Since Provost Britz has no advanced discrimination or retaliation training and his voice was the final decision that forced me to take involuntary leave, left me without an advisor, without an AOP grant, without dissertator status, without health benefits and caused me pain and suffering, I am claiming that his actions are retaliation and serving as the final word of the University would dissuade a reasonable person from complaining about discrimination and retaliation. See Appendix 10.

143. I claim that in doing so, the University has given up its affirmative defenses for retaliation against protected actions.

144. I have also reviewed the discriminatory policy of UWM and they do not factor in the concept of dissuading a reasonable person from complaining in its wording. The University should lose an affirmative defense because there is no wording on "dissuading a reasonable person from complaining" about discrimination (See https://www4.uwm.edu/secu/docs/other/S_47.pdf).

145. I also claim that through the OCR complaint, the University had been fully notified that I claimed that through these actions the Provost and thus the University was retaliating against me for my protected actions.

146. Though the OCR complaint was dismissed without finding, there has been no action by the University to correct any of these matters and the University seems to think that the dismissal meant that there was no retaliation. I disagree and claim that the University actions and process and allowing a non-discrimination trained academic officer to issue the final word is indeed retaliation.

147. I was subjected to adverse Hostile Education Environment as the denial of registration from not having an advisor prevented you from completing my doctoral program and from doing research in New York City regarding my dissertation topic. Hence, Provost Britz

retaliation included the rubber stamping of the EDS findings without having any advanced anti-discrimination training harmed me.

148. In spite of falsely labeling me "subpar academically" and defaming my academic and professional character, UWM awarded me the Chancellor's Award several times – ironically, the last time being in Fall of 2015.

Count I
Violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 stat. 252)
Plaintiff was subjected to adverse action as a result of his natural origin by the University through its officials.

Plaintiff incorporates the preceding paragraphs as set forth fully herein.

Count 2
Violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 stat. 252)
Plaintiff was subjected to adverse discriminatory action as a result of his race by the University through its officials

Plaintiff incorporates the preceding paragraphs as set forth fully herein.

Count 3
Violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 stat. 252)
Plaintiff was subjected to a Hostile Educational Environment by the University through its officials.

Plaintiff incorporates the preceding paragraphs as set forth fully herein.

Count 4
Retaliation by Dr. Sommers
Violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 stat. 252) prohibits intentional discrimination implicitly prohibits acts of retaliation for complaints about or opposition to discrimination.

Patrick Delices further alleges that "[a]t various times in the recent past, [he] engaged in protected activity by voicing concerns and complaining about discriminatory and unfair treatment to his former advisor Dr. Sommers.

Patrick Delices alleges that he opposed discriminatory practices of the University and took specific actions. He complained in an email. He filed an OCR complaint. He filed an EDS complaint to exhaust his remedies.

Patrick Delices alleges that as a result of her activities – The former advisor retaliated against him by changing his attitude one he disagreed with him changing his proposed dissertation topic;

creating a burdensome action of constantly updating his reading list for preparation of the preliminary exam; failing him on his exam; Denying him the AOP fellowship

After filing complaint with the Office of Civil Rights

Defendant Dr. Sommers removing himself as his advisor after Patrick Delices passed the second exam. Defendant Dr. Sommers failed to complete initial administrative work assignment to dissertator status;

After filing internal complaint with EDS

Defendant Dr. Sommers did not provide him with a temporary advisor; making a false analysis that his grades were dropping in EDS proceedings.

Plaintiff incorporates the preceding paragraphs as set forth fully herein.

Count 5
Violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 stat. 252)
Retaliation Dr. Anika Wilson

Violation of Title VI prohibits intentional discrimination implicitly prohibits acts of retaliation for complaints about or opposition to discrimination.
Plaintiff incorporates the preceding paragraphs as set forth fully herein.

Count 6
Retaliation Dean
Retaliation by Dr. Sommers
Violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 stat. 252)
Prohibits intentional discrimination implicitly prohibits acts of retaliation for complaints about or opposition to discrimination.

Patrick Delices further alleges that "[a]t various times in the recent past, [he] engaged in protected activity by participating in a student complaint, filing an initial complaint to the OCR, by filing an EDS complaint that the Dean was aware of.

Plaintiff incorporates the preceding paragraphs as set forth fully herein.

Count 7
Retaliation Provost
Violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 stat. 252)
Prohibits intentional discrimination implicitly prohibits acts of retaliation for complaints about or opposition to discrimination.

Count 8
First Amendment – Fee Speech

Plaintiff incorporates the preceding paragraphs as set forth fully herein.

Count 9
Fourteenth Amendment – Equal Protection

Plaintiff incorporates the preceding paragraphs as set forth fully herein.

Count 10
Violation of Wisconsin Defamation Law
1) a false statement; (2) communicated by speech, conduct or in writing to
a person other than the person defamed; and, (3) the communication is unprivileged and tends to
harm one's reputation so as to lower him or her in the estimation of the community or to deter
third persons from associating or dealing with him or her.

Plaintiff incorporates the preceding paragraphs as set forth fully herein.

Count 11
Violation of NYCHRL § 8-107 Section 4 Public accommodations a. It shall be an unlawful
discriminatory practice for any person, being the owner, lessee, proprietor, manager,
superintendent, agent or employee of any place or provider of public accommodation, because of
the actual or perceived race, creed, color, national origin, age, gender, disability, marital status,
partnership status, sexual orientation or alienage or citizenship status of any person, directly or
indirectly, to refuse, withhold from or deny to such person any of the accommodations,
advantages, facilities or privileges thereof, or, directly or indirectly, to make any declaration,
publish, circulate, issue, display, post or mail any written or printed communication, notice or
advertisement, to the effect that any of the accommodations, advantages, facilities and privileges
of any such place or provider shall be refused, withheld from or denied to any person on account
of race, creed, color, national origin, age, gender, disability, marital status, partnership status,
sexual orientation or alienage or citizenship status or that the patronage or custom of any person
belonging to, purporting to be, or perceived to be, of any particular race, creed, color, national
origin, age, gender, disability, marital status, partnership status, sexual orientation or alienage or
citizenship status is unwelcome, objectionable or not acceptable, desired or solicited.

Plaintiff brings attention to this court that Plaintiff believes that the discriminatory actions have
an impact in New York City for the discriminatory actions ended his academic career and sent
him back to New York City. Thus they had an impact in New York City.

Plaintiff incorporates the preceding paragraphs as set forth fully herein.

Count 12
Violation of NYCHRL § 8-107 Section 7. Retaliation

It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, (iv) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title, or (v) provided any information to the commission pursuant to the terms of a conciliation agreement made pursuant to section 8-115 of this chapter. The retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to employment, housing or a public accommodation or in a materially adverse change in the terms and conditions of employment, housing, or a public accommodation, provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity.

Plaintiff brings attention to the court that adverse action Provost Britz occurred after protected actions of bringing a student complaint to administrators, EEOC complaint, first OCR complaint, second OCR complaints EDS complaint, rebuttals to EDS complaints.

Plaintiff brings attention to this court that Plaintiff believes that Provost Britz final reports were retaliatory and were sent to Plaintiff in emails that were received in New York and the retaliation had impact in New York City. The retalitorial actions ended his academic career and sent him back to New York City. Thus they had an impact in New York City.

Plaintiff incorporates the preceding paragraphs as set forth fully herein.

Count 13
The Wisconsin Fair Employment State Law
The University discriminated against hiring Plaintiff in a teaching position as it did female students.

Plaintiff incorporates the preceding paragraphs as set forth fully herein.

Count 14
Violation of Wisconsin Social Media State Law
The University officials went on Plaintiff's social media to look for evidence to investigate and make charges against Plaintiff for their charge of Professional Misconduct.

Plaintiff incorporates the preceding paragraphs as set forth fully herein.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A. Defendant University of Wisconsin be served with process and answer herein;

B. An award of damages in an amount to be established at trial, including, without limitation, reimbursement and prepayment for all Plaintiff's tuition or related expenses; payment of Plaintiff's expenses incurred as a consequence of the discrimination and retaliation; damages for deprivation of equal access to educational benefits and opportunities provided by the Defendant and agents; and damages for past, present and future emotional pain and suffering, ongoing and severe mental anguish and loss of past, present and future enjoyment of life;

C. An Order enjoining the University of Wisconsin Milwaukee, along with all of its agents, employees, and those acting in concert therewith, from unlawful discrimination on the basis of sex, including the failure to address, prevent, and/or remedy sexual harassment.

D. Injunctive relief requiring University of Wisconsin-Milwaukee to redress its violations of Title IX including: 1) adoption of a "zero tolerance" policy under which there will be mandatory investigations into any allegations of sexual assault by an employee upon a student and immediate terminations thereto.

E. Attorney fees when an Attorney his hired

F. Cost for trying this action

G. Costs to be taxed to Defendant

H. For such other and further relief as the Court may deem proper and

I. For pre and post judgment interest.


PLAINTIFF DEMANDS TRIAL BY JURY RESPECTFULLY SUBMITTED this the _3_th day of _____ 2017

/s _____

Patrick Delices

Pro Se

# APPENDIX 1

## Graduate Students' Grievances and Solutions

March 26, 2014

Our interests lies in making sure that the current and prospective graduate students have a fulfilling experience. With that being said, below are some impediments and solutions that we are presenting. We kindly request a response back from the Graduate Affairs Committee by April 11th regarding the plans to resolve our issues.

Grievances and Questions:

- We disagree with the purpose of comprehensive exams. If we are receiving a grade in the class, what is the purpose of an extra written exam?
- Students in the Political Economy and Public Policy tract have no guidance for preliminary exams. There is no structure for the exams at all. This issue need to be addressed immediately.
- Students who enter the program with a graduate degree in a related field should receive more credits for the work they have completed.
- Students who have teaching and/or teaching assistant experience should be able to teach a class earlier than their third year.
- Low teacher expectations from graduate professors needs immediate attention. What our professors expect from us influences how they teach, how much they cover, and our performance as well.
- Not hiring Black Studies graduates is problematic because it sends a message to current Africology students, who are considering teaching careers, that our field is not hiring its own. Additionally, some professors hired from outside of Black Studies may not have a grounding in the field, which restricts their ability to teach from a africological perspective.
- The exclusion of grad students from both the hiring process as well as the Graduate Student Committee creates a disconnection within the department. It also is not conducive to a collective of students, professors and staff working together to strengthen the department.
- The lack of transparency in the department creates an atmosphere of uncertainty on behalf of the students in regards to expectations and requirements.
- Teachers need to be prepared for student TA's. Also, TAs are contracted for 20 hours of work per week. How is it justified that a TA who teaches two sections of their own course are considered to be working the equivalent to a TA who is working with a professor. This is especially in light of the new policy that TAs with low enrollment now have to work on other department committees.
- The statistics course currently not serving students. As an interdisciplinary department, students should learn techniques that they are likely to use in their research. The way the class is taught now does not allow students to leave the class being able to conduct their own experiments or interpret statistical scholarly papers.

There needs to be a key to the main office that we can keep in the TA office.

In order to work with the department in re-creating and re-structuring a program that meets the needs of current and future students, we have provided a list of solutions for your consideration.

Proposal of solutions to our grievances:

- Our main concern is focused on the Graduate Affairs Committee. This is where we feel we can make the most impact and where the faculty has the opportunity to be transparent. By being on the GAC we can work with the professors on the more long term concerns. The GAC meeting needs to be open to all students and faculty that want to attend for observance. We also demand at least 2 active seats on the Graduate Affairs Committee. AGSA would decide on how we will select these 2 seats.

- As a solution to our concerns of comprehensive exams, there should be an alternative to comprehensive examinations. It should be an oral exam, or students should be able to submit a MA thesis or MA exam in a related field.

- As a solution to the hiring practices of the department we should have students more involved in the hiring process. This involvement needs to go past attending job talks and submitting feedback. Students from specific tracts should be involved in hiring new faculty in their relative tract.

- There needs to be an external evaluation of the department from an Africological perspective e.g. a committee of professors/students from other black studies departments or revered persons in the field. Graduate students need to be fully and actively involved in choosing who would perform the audit. The external review provides a third party perspective, and speaks to all of the concerns that we have of the department by providing multiple critical views of the functioning of the department. This also speaks to black studies departments in total being more collaborative and cohesive.

- As a solution to the credit transfer of students who come into the program with a graduate degree in a related field, the number of credits able to be transferred should be up to half of what is now the 48 credit requirement of course work. This should be based off of the student holding a degree in a related field and a course subject matter comparison rather the the current course to course comparison.

- As a solution to the language requirement concerns students who fulfilled a comparable language/statistics requirement at another institution, and ESL students should be considered to have fulfilled the language requirement.

- As a solution to the issues with the statistics course, the statistics course should have 2 objectives; 1. To teach students to interpret statistical scholarly papers 2. To teach students to conduct statistical tests using regression and ANOVA/MANOVA as well as how to use statistical software. There should be an application focus through a project.

- Not solution to current grievances but a process that needs to be implemented: AGSA needs to be fully engaged in planning New Student Orientation. We would go above and beyond the current NSO to fully welcome new students into the department and the city of Milwaukee.

We look forward to working with you to resolve this issues.

Thank you,
Concerned Graduate Students

APPENDIX 2

Sommers/Winkler Correspondence

-----Original Message-----
From: Jeffrey W Sommers
Sent: Tuesday, August 18, 2015 2:16 PM
To: Erin N Winkler
Cc: Patrick Delices
Subject: Patrick Delices coursework

Hi Erin,

Question regarding fall semester for Patrick Delices (who is cc'd in this email). He needs to take 8 or 9 credits to maintain his AOP, but he has fulfilled his course requirements for our program.

Question: can he take 3 credits of Africology 325 and then 3 of 799 for Prelim prep and another 3 of 799 for Doctoral Dissertation Prospectus prep for a total of 9?

He intends to take his prelim in January.

Regards,

Jeff


From: Erin N Winkler
Date: Mon, Aug 24, 2015 at 3:51 PM
Subject: RE: Patrick Delices coursework
To: Jeffrey W Sommers
Cc: Patrick Delices <pdelices@gmail.com>


Dear Jeff,

I don't think the two different 799s should be a problem, but they would have to be with different faculty (a student cannot sign up for the same course twice in one semester, which your section of 799 would be). Also, there would have to be 799 paperwork for each justifying the 3 credits, so there would have to be documentation that each would require 3 credit hours' worth of work for the Fall 2015 semester. Alternately, one of the 799s could be taken for only two credits.

It seems like it would make the most sense for another member of the dissertation committee to be the instructor of record on one of the 799s.

I hope this helps,
Erin

**APPENDIX 3**

<div align="center">

**PATRICK DELICES**

**OCR COMPLAINT**

**2/29/16**

</div>

## I. Summary & Legal Standards Review

The actions of the University of Wisconsin-Milwaukee (UWM) against me resulted in unlawful discrimination based on race in two ways. First, I was subject to differential treatment based on my race and its inextricable link to my political and community affiliations as evidenced by the retaliatory actions of arbitrary modification of the preliminary exam requirements (question, bibliography, and an administration date) along with the rescinding of the Advance Opportunity Program (AOP) fellowship for the 2016-2017 academic year. Second, UWM's lack of clarity in addition to the absence of due process has a disparate impact upon the student body within the Department of Africology, which is primarily compromised of minority students.

As such, this disproportionate impact upon me comes from the arbitrary investigations of vague and irrelevant allegations along with the conclusory manner of the resulting investigations without offering me a full hearing or vetting the merit of any claims against me. Taken together, the University's actions likely have had an unjustified impact upon me, and likely upon other predominantly minority race students in the Department of Africology at UWM. Therefore, an OCR investigation is necessary to determine the extent of the impact upon this protected class, and to compel the University to publish a clear disciplinary code, process, and procedure for any student alleged to have a violated a regulation, policy, or procedure.

*Different Treatment*

Particularly relevant to my complaint is (according to OCR's website - http://www2.ed.gov, including, but not limited to), a compliance resolution letter from Sun Prairie School District, WI, (**Re: OCR Case #05-11-5003**) which states the following:

> Title VI prohibits schools from intentionally treating students differently based on race. Enforcement of a rule or application in a discriminatory manner is prohibited intentional discrimination. When similarly-situated students of different races are treated differently, OCR assesses the recipient's explanation for the differences in treatment to determine if the reasons were legitimate and nondiscriminatory, or were a pretext for unlawful discrimination. Additionally, OCR examines whether the recipient treated a student in a manner that was inconsistent with its established policies and procedures or whether there is any other evidence of race discrimination.
>
> Intentional discrimination in the pre-referral, referral, evaluation, and placement of students in special education can take many forms, however, and can be proven even

without the existence of a similarly-situated student. Additionally, a school's adoption of a facially-neutral policy with an invidious intent to target certain races is prohibited intentional discrimination.

Whether OCR finds a violation of Title VI will be based on the facts and circumstances surrounding the particular situation.

I argue that the present situation is a violation of my civil rights based upon my race and national origin, in that these identities are central to the political and racial community affiliations questioned by Dr. Anika Wilson during an investigation interview. Further, the investigations themselves and the preliminary exam modification and result were retaliatory actions against me for the aforementioned affiliations and for sharing grievances that UWM'S Department of Africology discriminates in its student employment practices based upon sex/gender in that department.[1]

---

[1] As a Black (Haitian-American) male doctoral student with considerable higher education teaching experience, I inquired about teaching a course within the Department of Africology in 2014 and 2015 where the current and former chairpersons (both women) were made aware of my desire to teach at UWM's Department of Afrcicology. It has been my understanding that UWM (Department of Africology) does not have a formal, transparent process for submission of teaching applications for PhD candidates. Instead, recruitment and hiring are completed by faculty behind closed doors. By late 2015, it became clear to me that UWM's Department of Africology exhibits a pattern of hiring predominantly Black female doctoral students to teach courses in africology. The Black male doctoral students are relegated to serving as teaching assistants (TAs). Currently, there are 11 doctoral students in africology: three Black male students; one White male student; and seven Black female students. My understanding is that five out of the seven Black female students were selected to teach courses in africology, while the Black male students were merely offered teaching assistantships. This pattern continues despite any differences or similarities in PhD candidates experience level and qualifications. General information about UWM's Africology PhD candidates is available to the general public on the department's website. My personal example is that I have never been offered a position, or perhaps more importantly, a reason for denial of my candidacy. I am aware that the women who hold the coveted positions do not hold experience and qualifications equal to mine, including over seven years teaching Black Studies at the undergraduate level at Hunter College of the City University of New York in addition to substantial experience in university settings, including serving as a research fellow at Columbia University and as a career services professional at multiple institutions. As recently as around July of 2015, I verbally expressed my concern regarding this gender disparity in teaching within the Africology Department at UWM to the faculty member assigned as my advisor, Dr. Jeffrey Sommers. I articulated my continued desire to obtain a doctoral taeching position and Dr. Sommers requested that I provide him my curriculum vitae for the department's consideration. Shortly after I provided a current copy of my curriculum vitae, I learned that a person in which UWM officials would only identity as a "whistleblower" provided false and inaccurate information about my employment status and professional designation. At no time did any UWM official contact me regarding the status of my candidacy for a teaching position. Title VI of the Civil Rights Act applies to employment cases and discrimination based upon sex, gender, race or national origin. The discriminatory practice here results in the students at UWM being harmed in that interested Black males are not provided the opportunity to obtain teaching positions available to their female counterparts. It is arguable that the students are also harmed by sitting through inferior instruction when a department fails to hire the most qualified applicant to teach a particular course. Without a transparent recruitment practice open to all qualified individuals, it is impossible for the University and interested parties such as your office to guarantee that the Department of Africology fairly evaluates all doctoral students/candidates without automatic exclusion based upon an individual's sex/gender. Therefore, I ask that your office to compel UWM to disable and cease the practice of covert selection of female doctoral students to teach courses in africology and replace it with fair and open recruitment and hiring policies and procedures in order to safeguard equal protection, access, and opportunity under the law.

*Disparate Impact*

According to OCR's website, "in addition to different treatment of students based on race, schools violate Federal law when they evenhandedly implement facially neutral policies or practices that were not adopted in order to discriminate but their implementation nonetheless has an unjustified effect of discriminating against students on the basis of race. The resulting discriminatory effect is commonly referred to as "disparate impact." Moreover, OCR's website states the following:

> Facially neutral pre-referral, referral, evaluation, and placement policies that result in an adverse impact on students of a particular race will be evaluated against the disparate impact standard to ensure that they are not discriminatory. In examining the application of a facially neutral policy, OCR will consider whether the policy results in an adverse impact on students of a particular race as compared with students of other races; whether the applicable policy is necessary to meet an important educational goal; and even in situations where the policy is necessary to meet an important educational goal, whether there are comparably effective alternative policies available that would meet the stated educational goal with less of a burden or adverse impact on the disproportionately affected racial group or the proffered justification is a pretext for discrimination.

Due to the actions of UWM, I am unable to provide further evidence of any disparate impact upon other students (I believe the negative impact upon me is clearly established by the facts). The actions I refer to include UWM's failure to provide me with the opportunity to seek a full hearing regarding the allegations against me and the refusal to provide all the materials UWM gathered to use as evidence against me. Therefore, such a lack of information prevented me from being able to adduce facts favorable to me that contradict UWM's claims including the chance for me to try to gather third party documents, pose clarification questions to UWM's agents and employees, and to then access and compare the University's determination in my case to those of any similarly situated students to see if I was treated similarly to students who were similarly situated to me.

Upon review of the attached information and its own investigation, I urge OCR to hold UWM accountable to rectify the agency's practice of blatantly violating students' rights when it benefits the University and its faculty or staff. I urge OCR to conclude that failure of a state-run public university should not be able to make an end run around its obligation to comply with the Civil Rights Act by issuing conclusory decrees in the face of contradictory evidence which allows for limited, if any, comparison between student's cases and to be able to determine if the University acts in any consistent manner. I argue UWM's admitted lack of policy for allegations and investigations such as those undertaken here should not serve as a justification to deny an inquiry into whether or not their actions were applied in a discriminatory manner, where there is a colorable claim that race was a factor in the differential treatment taken against me by the University.

At the least, I ask OCR to compel UWM to provide a reasonable basis for its actions against me; to identify the whistleblower; and provide me an unbiased forum to complete my dissertation in

furtherance of obtaining my PhD. To protect the civil rights of the other current and future students, I ask that UWM be required to implement and adhere to clear policies regarding disciplinary codes; require staff to undergo civil rights and implicit bias training; advise students of their right to a hearing should allegations be made against them; provide the student with all information the University gathered about the student in advance of the hearing; and allow for third party review.

**II Preliminary Exam & Retaliation:**

I was admitted to UWM in the fall of 2013 as a doctoral student in africology. My assigned doctoral advisor was Dr. Nolan Kopkin. Later, by the spring of 2014, the professor designated as my advisor was Dr. Jeffrey Sommers who immediately sought my expertise with a book about Haiti in which he needed assistance completing to be able to have it published. In exchange for my expertise and "co-authorship" (contributions), Dr. Sommers wanted me to edit his work, including adding and updating facts and arguments, and write "chapters," (introduction and epilogue). I agreed to assist with the book, and began contributing under the assumption that the work on the book would not interfere with my progress towards the PhD.

By the spring of 2015, I completed sufficient coursework to be considered disserter status and requested to sit for my preliminary examination. By June 28, 2015, Dr. Sommers approved my request to take the preliminary exam, confirmed a bibliography for the exam of about 55 books on Haiti, and sent me the exam question. The topic was essentially the history and political economy of Haiti from colonialism to independence to Haiti's present state (See Exhibit 1) which basically related to the book "chapters" (introduction and epilogue) that I wrote for the book.

At that time, Dr. Sommers did not provide a date to sit for the exam, which is required prior to the test's commencement. Throughout the summer of 2015, I repeatedly spoke with Dr. Sommers and requested a preliminary exam date. Instead, Dr. Sommers steered the conversation to the completion of the work for the book. (It is worth noting that it was during this summer that I submitted my curriculum vitae to Dr. Sommers and discussed gender disparity regarding teaching courses in africology). As Dr. Sommers was my academic advisor with discretionary power over approval of my disserter status, I felt compelled to complete the extracurricular work for the book without complaint.

By the fall of 2015, Dr. Sommers still had not provided me with a preliminary exam date. Instead, he inexplicably changed the topic of the preliminary exam to include theories of imperialism and added a second bibliography – this one on imperialism. Dr. Sommers also changed sporadically the selected documents (the two bibliographies on numerous occasions as late as December of 2015 – take note that my prelim exam was in January 4, 2016). The number of publications ultimately selected for me ballooned from about 55 in June of 2015 to 117 by December of 2015. My understanding after conversations with other students is that other doctoral students in the program with approved bibliographies were required to review about 30 - 40 publications and had one bibliography not two. The vast difference in approved bibliography lengths and the timing of the bibliography and topic modification support my belief that these

actions were taken in retaliation against me, to assure UWM would be able to claim I failed the resultant examination.

Finally, in January 4, 2016, I was afforded the opportunity to take my prelim and submit the exam within a week. Dr. Sommers issued a failing grade on the exam and wrote "passing this prelim exam will take much work (reading or re-reading) in order to better see the intersection between Haiti's development through the prism of theories of economic development and imperialism. I have to be honest and state that it will be a steep climb to gain mastery, or even general competence, of these topics." (See Exhibit 2). Dr. Sommers' email failed to mention that the incorporation of the theories of economic development was not part of the exam preparation – Dr. Sommers did not request for me to focus on the theories of economic development for this preliminary exam and interestingly, the other two committee members (Drs. George Bargainer and Harwood McClerking) were not copied on his exam question (See Exhibit 3).

To date, no other committee members (Drs. George Bargainer and Harwood McClerking) offered any feedback regarding this exam. My understanding is that it is highly unusual for committee members to remain silent regarding their opinion of such an important examination, for if a student "so clearly missed the mark," professors generally offer tips to improve the quality of the student's work. Finally, the language of the email quoted is chilling and shows a predisposition of Dr. Sommers to fail me, regardless of the quality of any future work submitted. It must be noted that the exam reflected the work that I have completed in writing the introduction and conclusion of the book with Dr. Sommers that was published by November 2015. If I am good enough to "co-author" (contribute) to a book with Dr. Sommers, I am good enough to pass the preliminary exam. As such, the result of the exam should be considered invalid and passing by default. Moreover, UWM should be required to offer completion of future examinations and writing by an impartial party.

### III. AOP Fellowship Denial for 2016-2017 Academic Year is Retaliation

In August, 2015, UWM sent me a letter stating my federally funded AOP fellowship of $15,000 per academic year was being rescinded because a "whistleblower" advised UWM officials that I was employed at 4T's, a non-profit in NYC (See Exhibit 4). UWM officials stated that part of the basis for their belief that I was working in NYC was a posting on a website for 4Ts where the employer failed to update to reflect that I moved on from a position I held there many years ago. Upon my provision of proof including a signed, notarized letter from the founder/alleged employer - 4Ts (See Exhibit 5), UWM reinstituted the fellowship for the 2015-2016 academic year (See Exhibit 6).

On December 18, 2015, I requested for Dr. Sommers to approve my renewal of the AOP Fellowship. And he replied, "I discussed the AOP issue with our graduate faculty. Given the problems that surfaced this past year, it was decided another year's AOP support can't be tendered" (See Exhibit 7). I question how this decision was made, and who determined what "problems" warranted the termination. As part of my AOP Fellowship defense, I reminded

UWM that I cannot control third party websites or when they update them, and Dean Marija Gajdardziska-Josifovska of UWM wrote "I agree with your statements about web pages" (See Exhibit 8).

The rescission of the AOP fellowship for 2016-2017 is retaliatory as UWM's graduate school elected reinstatement for 2015-2016 after I successfully rebutted an unfounded, erroneous allegation that I was employed at the relevant time period, and where nearly all the information discussed during the misconduct/misrepresentation investigation was readily available for review.

Further evidence of retaliation and differential treatment are UWM's decisions to investigate me in the first place. During the AOP investigation, I told Dr. Sommers that I was NOT working in New York, but that I knew of a few other students who were working in violation of the terms of their fellowship. Therefore, UWM is aware of other students violating the terms of their fellowship. However, it elects not to pursue an investigation. If the word of a "whistleblower" is enough to investigate me, why is my word not enough to investigate the other students? I urge OCR to hold UWM to task for selectively enforcing violations of stipulations placed upon publicly funded fellowships, particularly in this situation where there is a substantial likelihood the decision was made based upon my race and national origin.

## IV. Professional Misconduct/Misrepresentation: Investigations as Differential Treatment and Lack of Due Process.

In November 2015, after I defeated the allegation that I was working in violation of my AOP fellowship, UWM advised me that I was being investigated for "professional misconduct" or "professional misrepresentation." According to UWM, the University elected to form a committee to investigate me after hearing from a "whistleblower" at issue before that I am referred to as a "Dr." or "professor" on the Internet. During the investigation, UWM invited me to an investigation interview where I spoke with Dr. Anika Wilson.

During our interview, I specifically asked Dr. Wilson, what UWM policy I stood accused of violating and what laws I allegedly obstructed - Dr. Wilson identified none. In fact, the school conceded that there is "no prescribed policy" on "professional misconduct" or "professional misrepresentation" (See Exhibit 9). Moreover, Dr. Wilson failed to articulate the University's definition of "professional misconduct" or "professional misrepresentation." However, the university determined that my "behavior" fell within UWS 17.9.11. This regulation pertains to those who have made a false oral or written statement to an agent or employee of UWM regarding a university matter or refused to comply with a "reasonable request" regarding a university matter (See Exhibit 9).

As evidence of this vague "misconduct," UWM codified publicly available websites including articles published online and references about me on social media websites and used these websites/articles to create a "Patrick Delices' Misrepresentation File" (See Exhibit 10). Again, as part of my defense, I reminded Dr. Wilson that I cannot control third party websites and what they say – Dean Marija Gajdardziska-Josifovska of UWM wrote "I agree with your statements about web pages" (See Exhibit 8).

Many of the websites list contradictory or slightly incorrect information - none referenced me as a professor at UWM. The sites often list the academic degrees I earned from Columbia University - School of International and Public Affairs and Teacher's College; NYU Stern School of Business; my previous work as a research fellow with Manning Marable; work as an adjunct professor at Hunter College; or refer to other articles I've written, and occasionally conflated different aspects of my background. Few, if any, third party websites erroneously state that I hold a PhD or refer to me as Dr. Delices.

However, there are a fair number of sites where I am referred to as "professor." I taught undergraduate courses within the City University of New York, where schools such as Hunter College use the term "adjunct professor" to describe part-time instructors. Third party sites often run with "Professor Delices" as outside academic circles, and particularly in urban environments with dense foreign born populations, where many people do not have the privilege of having multiple graduate and undergraduate degrees and university exposure to the American system where it is exceedingly common for members of the public to refer to anyone teaching at the collegiate level as "professor." It is unreasonable to expect members of the general public to verse themselves in the intricacies of academic parlance, and in fact, dictionary definitions are being changed to reflect broad usage of the term professor. In no way does failure to chastise third parties for adopting this usage of professor equates to me, or any other current or former adjunct, holding out as having achieved a specific academic rank.

For clarification, before and during my time at UWM, I submitted written articles to the *New York Amsterdam News*, *Black Star News*, and other publications. Most of my writings deal with Black politics, race, systemic reformation, systemic oppression, and economic, political, and socio-cultural exploitation inside and outside the United States. During the investigation interview, Dr. Wilson questioned me about my political affiliation and social relationship with various media outlets and political organizations such as the *Final Call, Nation of Islam, Institute of the Black World,* and *Legacy of 1804* – these particular organizations deal with economic, political, and cultural issues involving race, gender, religion, racism, colonialism, and oppression. Thus, my politics on race, gender, and religion in addition to my political association with certain racial political groups became a topic of conversation during the interview.

I asked why my affiliation with these particular organizations was an issue in this discussion as they and their representatives are not UWM officials. It is of note that my affiliation with any groups outside academia that didn't reference race and racial politics was not discussed. I expressed my discomfort to Dr. Wilson regarding the interview and investigation process and procedure as the area of inquiry narrowed down to target my political affiliation with organizations that centered around racial and gender politics. To the point, I referenced myself to Dr. Wilson as being akin to the Trayvon Martin of UWM - unnecessarily targeted because of my race, gender, and age - subject to investigation by parties with no legitimate authority over me and my First Amendment rights, and interest in my activities for precisely those reasons. Of note was the absence of inquiry regarding affiliations with any groups where race and sex/gender are not at issue, including past participation in alumni events and organizations at NYU-Stern and Columbia University.

It is also alleged that I referred "misrepresented" myself to obtain desk copies of a book in 2015. In terms of the desk copy, I informed Dr. Winkler via email that it was a misunderstanding - I gave the publisher Dr. Winkler's email in hopes of confirming the fact that I am a doctoral student and a former teacher's assistant at UWM in need of a book for research purposes.

In evaluating whether or not this investigation is resultant determination violates the Civil Rights Act, it is relevant that Dr. Wilson indicated that she also interviewed Dr. Sommers. I vehemently reject the Committee's assertion that Dr. Sommers "warned" me about "professional misrepresentation" or "professional misconduct" during the spring of 2015. As a matter of fact, the editor of Lexington Books referred to me as "Dr. Delices" in a contract letter to Dr. Sommers. (See Exhibit 11). Dr. Sommers did not correct the publisher, though here the University's interests are at issue since UWM is named in the publication.

The fact that I was investigated as a student for the same behavior exhibited by Dr. Sommers is clear evidence of differential treatment. It is egregious that this professor is also my advisor, and yet as the investigated student, I sit subject to disciplinary action determined in large part by UWM's reliance upon the unsubstantiated word of the same professor. Had I been afforded a full hearing, I would have brought out the University's inconsistency: Here, the University does NOT hold Dr. Sommers accountable for failing to correct a publisher's erroneous declaration of me as "Dr." for a book clearly attributable to UWM – yet, holds me liable as a student for third party statements where UWM is not even mentioned.

## V. Conclusion:

It is my contention that the manipulation of the preliminary exam, its result and the "professional misconduct" conclusory determination violated my rights pursuant to Title VI, as my status as a Black Haitian American with political affiliations described above informed the actions of the University and its agents. I ask that OCR find that UWM took the above actions against me because of my race, national origin, gender, age, racial political affiliations and racial political writings that are inextricably informed these immutable characteristics. And to the extent that such consideration is appropriate here, I ask OCR to consider that the initial investigations and actions taken thereafter stem in part from retaliation against me for expressing concern over the sex/gender disparity in the Africology Department's employment of solely doctoral female student to teach courses in africology.

At a bare minimum, I seek that OCR conduct a fair hearing presided over by an impartial decision maker where the University would be required to prove its allegations against me in accordance with basic due process requirements. This includes a clear description of the allegations, full disclosure of any material they collected regarding me in advance of a hearing; the opportunity to seek clarification of any interviews of third parties, including the whistleblower and the University's professors; and the ability to question the entities responsible for electing to pursue the allegations of professional misconduct and the initial AOP investigation against me. Given the retaliatory, hostile, and chilling environment at UWM's Department of Africology (See Exhibits 7 &12), I also seek, without taking additional courses and exams, from OCR and the University my immediate transfer to a PhD program at University

of Wisconsin-Madison, or alternative unbiased department at UWM for the fair evaluation of the dissertation that I plan to complete towards consideration of attaining doctorate.

APPENDIX 4

EDS 16-0111 a-e with Exhibits



UNIVERSITY of WISCONSIN

Global Inclusion and Engagement

*Office of Equity/Diversity Services*

---

| To: | Erin Winkler | | Mitchell Hall, Room 359 |
|---|---|---|---|
| | Chair, Department of Africology | | P.O. Box 413 |
| | | | Milwaukee, WI |
| From: | Nelida Cortes | | 53201-0413 |
| | Interim Director, Office of Equity/Diversity Services | | (414) 229-5923 phone |
| | | | (414) 229-5592 fax |
| Date: | May 2, 2016 | | www.diversity.uwm.edu |
| | | | diverse@uwm.edu |

RE:   **NOTICE – Discrimination Complaint**

| Complaint #: 16-011 (A) | Complainant: Patrick Delices |
|---|---|
| | Respondent(s): Erin Winkler |

This memorandum is to formally advise you that the Office of Equity/Diversity Services (EDS) has received a complaint from Patrick Delices. The complaint alleges that you have subjected him to discrimination based on race, color, ancestry, sex, gender, national origin, age, political affiliation and retaliation.

This complaint is being processed in accordance with the University of Wisconsin-Milwaukee's Discriminatory Conduct Policy (Including Sexual Harassment and Violence) No: S-47. As is stated in the Policy, EDS may negotiate a resolution of a complaint and is willing to assist the parties in this process. Please contact our office if you would like to discuss this option in more detail. In the meantime, EDS will begin its investigation of this complaint. A member of the EDS staff will contact you during our investigation to schedule an interview in order to elicit your response to the allegations noted in the complaint.

The Policy provides that "[a]ll individuals involved in the investigation and resolution of a complaint are expected to maintain the confidentiality of the complaint and resolution to the maximum extent possible under the circumstances. Certain disclosures, however, may be necessary to complete the investigation and/or resolution of the matter." As such, you should not discuss these allegations with colleagues or other third parties.

In addition, the Policy also prohibits retaliation against the individuals who engage in protected activities, including filing complaints or participating as a witness in the investigation. During the course of this investigation, it is critically important that you avoid any conduct that would be inappropriate or harassing, and any conduct that could appear to be retaliatory. If you have any questions about this directive, please feel free to contact me.

Consistent with the Policy, a copy of the complaint is enclosed. Please let me know if you have any questions.

cc   Patrick Delices, Complainant
     Rodney Swain, Dean for the College of Letters and Sciences
     Joan M. Prince, Vice Chancellor for Global Inclusion and Engagement
     Rob Smith, Associate Vice Chancellor for Global Inclusion and Engagement
     Johannes Britz, Provost and Vice Chancellor for Academic Affairs

## GENERAL INFORMATION:

| | |
|---|---|
| Name of Complainant: Patrick Delices | |
| Complainant Home Address: 948 Longwood Avenue – Bronx, New York 10459 | |

| Phone #: 917-403-5381 | Email: pdelices@gmail.com | Other Phone #: |
|---|---|---|

University Status:    Student    Staff    Faculty    Other

Name of Respondent(s): Erin Winkler (chairperson/faculty), Anika Wilson (faculty), Nolan Kopkin (faculty), Daniel McClure (faculty), and Jeffrey Sommers (doctoral advisor/faculty), and John Doe ("the whistle-blower").  It must be noted that John Doe's relationship to me is unknown as the "whistle-blower"
has yet to be identified.

Respondent's Campus Address: Department of Africology – University of Wisconsin-Milwaukee – Mitchell Hall 225 – 3203 N. Downer Avenue – Milwaukee, WI 53211

| Phone #: Erin Winkler –414-229-5080 / Anika Wilson – 414-229-2889 / Nolan Kopkin - 414-229-4155 / Daniel McClure – 414-229-4155 / Jeffrey Sommers - 414-229-4155 | Email: winklere@uwm.edu, awilson@uwm.edu, kopkin@uwm.edu, mcclured@uwm.edu, and sommerjw@uwm.edu | Other Phone #: |
|---|---|---|

University Status:    Student    Staff    Faculty

Relationship to the Complainant: Faculty members in the Department of Africology.

## ALLEGATION BASE ON: (Please check the following that apply)

| Race or Color | Disability | Sexual Orientation | Retaliation |
|---|---|---|---|
| Veteran Status | Sexual Harassment | Age (40 or Over) | Sex/Gender |
| Ancestry | Pregnancy | Martial Status | National Origin |
| Religion | Sexual Assault | Arrest/Conviction Record | Gender Identity/ Expression |

Other: (Please Explain): Racial Political Views

| DATE(S) OF ALLEGED DISCRIMINATION/ HARASSMENT: | See Previous Attached Document. |
|---|---|

## INCIDENT INVOLVED: (Please check the following that apply)

| Terms and/or Conditions of Employment | Campus Housing |
|---|---|
| Terms and/or Conditions of Education | Student Programs |

Other: (Please Explain): See Previous Attached Document

## COMPLAINT:

Have you filed a discrimination or appeal with another university department, union or state or federal agency?  YES    NO ; If yes, please state the name of the agency and date filed:

ACLU – 12/30/2015; OCR – 1/29/2016; EEOC – 3/18/2016

**PLEASE DESCRIBE YOUR COMPLAINT:** *(If you run out of space, please complete on the back of this form.)*

I am complaining about age, race, national origin, and sex discrimination and adverse actions of the following individuals and collective: Erin Winkler, Anika Wilson, Nolan Kopkin, Daniel McClure, Jeffrey Sommers, and John Doe (the "whistle-blower"). They committed various forms of adverse and discriminatory actions against me including lack of equal opportunity (gender and age bias/discrimination) in the hiring practices of doctoral students as teachers as illustrated by Dr. Winkler; false, bias, and defaming charges of professional misrepresentation/misconduct as illustrated by Drs. Wilson, Kopkin, and McClure; disparate treatment and manipulation of my prelim exam question, bibliography, and evaluation by Dr. Sommers to hide his national origin discrimination and black racial/political bias; making the prelim exam testing process more burdensome and adverse in comparison to other students as illustrated by Dr. Sommers; dissuading me from doing academic work (dissertation) regarding my national origin of Haiti as illustrated by Dr. Sommers; disparate and unfair treatment based on my national origin and racial political views by Dr. Sommers as he is obstructing me from reaching disserter status and completing my doctorate in africology; abuse of power/authority by Dr. Sommers by using my race and national origin and expertise on Haiti to publish a book on Haiti and only to fail me on my prelim exam on Haiti; denial of my AOP fellowship by Dr. Sommers and what he stated, but did not identify as the "faculty committee;" ignoring and belittling my complaint of discrimination by not forwarding/recommending it to the Office of Equity/Diversity Services as illustrated by Drs. Sommers, Wilson, and McClure; recommended unconditional censure of my First Amendment rights which also violated my civil rights by not only questioning/interrogating me about my involvement with certain black political organizations and using such an affiliation to falsely accuse me of professional misrepresentation/misconduct as illustrated by Dr. Anika Wilson. Erin Winkler, Anika Wilson, Nolan Kopkin, Daniel McClure, Jeffrey Sommers, and John Doe (the "whistle-blower") engaged in the presumption of guilt (lacking integrity and being naive) in this adverse and chilling process as they discriminated against me due to my age, national origin, sex/gender, race, and racial political views. Thus, defaming me and creating a chilling, hostile, and adverse environment. In all stages of the investigation including the denial of my AOP fellowship, John Doe (the "whistle-blower") has been involved and all these parties listed above did not give me information about John Doe (the "whistle-blower") in order for me to defend myself. Moreover, the use of the term "whistle-blower" makes this discriminatory matter plausible because the "whistle-blower" does not deserve more protection and rights than the one being investigated and accused - how does the "whistle-blower" have more rights and protection than the one being accused? Nonetheless, in the previous attached pages, I have organized and included a detail description of my complaint with supporting documents for your review and records.

**RESOLUTION SOUGHT:**

See Previous Attached Document.

*The discrimination complaint process has been explained to me and I have received a copy of the policy. I certify that the information given above is true and accurate to the best of my knowledge or belief. The Office of Equity/Diversity Services has my permission to conduct pertinent inquires in regard to my complaint and to use my name in such inquires.*

| | 4/29/2016 |
|---|---|
| Signature of Claimant | Date |

**Referred By:** *(Please check the following that apply)*

| | |
|---|---|
| Advisor/Counselor | Supervisor |
| Campus Brochure | Training Seminar |

RECEIVED

APR 2 9 2016

Equity/Diversity Services
UW - MILWAUKEE

| Co-Worker | Union Stewart |
|-----------|---------------|
| Other: *(Please Explain):* | |

01/2016

Office of Equity/Diversity Services * University of Wisconsin-Milwaukee * Mitchell Hall 359
P.O. Box 413, Milwaukee, WI 53201
Telephone: 414-229-5923 * Email: diversity@uwm.edu * Fax: 414-229-5192

# DISCRIMINATION COMPLAINT FORM

## GENERAL INFORMATION:

Name of Complainant: *Patrick Delices*

Complainant Home Address: *948 Longwood Ave - Bronx, NY 10459*

Phone #: *917-Yad-9851*  Email: _____  Other Phone #: _____

University Status: ☑ Student ☐ Staff ☐ Faculty ☐ Other

Name of Respondent(s): *Department of Africology (See Attached Document)*

Respondent's Campus Address: *University of Wisconsin - Milwaukee - Mitchell Hall 225 - 3203 N. Downer Ave -*

Phone #: *414-229-5086*  Email: *winkler@uwm.edu*  Other Phone #: *414-229-5084*  *Milwaukee, WI 53211*

University Status: ☐ Student ☐ Staff ☑ Faculty

Relationship to the Complainant: *See Attached Document*

## ALLEGATION BASE ON: *(Please check the following that apply)*

☑ Race or Color    ☐ Disability          ☐ Sexual Orientation   ☑ Retaliation
☐ Veteran Status   ☐ Sexual Harassment   ☑ Age (40 or Over)     ☐ Sex/Gender
☑ Ancestry         ☐ Pregnancy           ☐ Marital Status       ☐ National Origin
☐ Religion         ☐ Sexual Assault      ☐ Arrest/Conviction    ☐ Gender Identity/Expression
                                            Record

☐ Other: *(Please Explain)*: _____

DATE(S) OF ALLEGED DISCRIMINATION/HARASSMENT: *See Attached Document*

## INCIDENT INVOLVED: *(Please check the following that apply)*

☑ Terms and/or Conditions of Employment    ☐ Campus Housing
☑ Terms and/or Conditions of Education     ☑ Student Programs
☑ Other *(Please Explain)*: *See Attached Document*

## COMPLAINT:

Have you filed a discrimination or appeal with another university department, union or state or federal agency?

☑ YES    ☐ NO ; *If yes, please state the name of the agency and date filed:*
*ACLU - 12/30/2015; OCR - 1/29/2016; EEOC - 3/18/2016*

PLEASE DESCRIBE YOUR COMPLAINT: *(If you run out of space, please complete on the back of this form.)*
*See Attached Document*

_____

_____

RESOLUTION SOUGHT: *See Attached Document*

_____

*The discrimination complaint process has been explained to me and I have received a copy of the policy. I certify that the information given above is true and accurate to the best of my knowledge or belief. The Office of Equity/Diversity Services has my permission to conduct pertinent inquiries in regard to my complaint and to use my name in such inquiries.*

*[signature]* _____          *4/18/2016*
Signature of Claimant                        Date

## Referred By: *(Please check the following that apply)*

☐ Advisor/Counselor    ☐ Supervisor
☐ Campus Brochure      ☐ Training Seminar
☐ Co-Worker            ☐ Union Steward
☐ Other: *(Please Explain)*:

01/2016

```
RECEIVED

APR 18 2016

Equity/Diversity Services
UW - MILWAUKEE
```

PATRICK DELICES

DISCRIMINATION COMPLAINT

UNIVERSITY OF WISCONSIN-MILWAUKEE

OFFICE OF EQUITY/DIVERSITY SERVICES

4/18/16

As an older (over 40 years of age) Haitian-American (black) male doctoral student at UWM, I wanted to notify your office about the disparate treatment that I received from UWM's Department of Africology. The disparate treatment has been chilling and has had an adverse impact on me. Therefore, I am formerly complaining to the University about discrimination based on race, national origin, sex, and age as exhibited by the Department of Africology. This discrimination cumulated in four major ways: 1) lack of equal employment opportunity to teach a course; 2) the denial of my AOP fellowship (See Exhibit 4 and Exhibit 7); 3) unfair accusation of "professional misrepresentation/misconduct" (See Exhibit 9); and 4) "failure" of the preliminary examination (See Exhibit 3).

I am claiming that younger doctoral students, particularly black female students, have preferential treatment regarding doctoral examinations and employment opportunities as instructors within the Department of Africology.[1] I am also claiming that I was unfairly targeted by the Department of Africology for the denial of my AOP fellowship and falsely accused of "professional misrepresentation/misconduct" by the same department. Moreover, I am claiming that bias played a major role in my preliminary exam evaluation.

---

[1] Since 2013, I made repeated requests to teach a course in the Department of Africology. By 2015, I became aware that the female doctoral students who held the coveted teaching positions do not hold professional experience and qualifications equal to my professional experience and qualifications which include over seven years of experience teaching Black Studies at Hunter College of the City University of New York; publishing; overseas travel and research in Tanzania, Kenya, Egypt, Zanzibar, Algeria, Western Sahara's refugee camps, South Korea, China, Spain, Chile, Brazil, Dominican Republic, Cuba, and Haiti; serving as a research fellow for the late Pulitzer Prize historian Manning Marable at Columbia University; and working as a career services professional at numerous institutions of higher education. Moreover, unlike any other PhD student at the Department of Africology, I hold four graduate degrees (an MS.Ed., in Education Administration and Supervision from the City College of New York; an EdM in Higher Education Administration at Teachers College, Columbia University; an MBA in Quantitative Finance, Business Law, and Global Business from New York University, Stern School of Business; and an MPA in International Economic Policy and Management from Columbia University, School of International and Public Affairs).

In November 2015, after I defeated the allegation that I was working in violation of my AOP fellowship, UWM's Department of Africology advised me that I was being "investigated" for "professional misconduct" and/or "professional misrepresentation." According to UWM, the University elected to form a committee to investigate me after hearing from a "whistleblower" at issue before that I am referred to as a "Dr." or "professor" on the Internet. For the "investigation," UWM invited me to an "investigation interview" where I spoke with Dr. Anika Wilson who headed the committee. Dr. Nolan Kopkin and Dr. Daniel McClure were also members of that committee. It must be noted that during the interview, Dr. Wilson never communicated to me the names of the other committee members. Also, during the interview, Dr. Wilson never communicated to me if the "whistleblower" was internal or external to the University and/or the Department of Africology. Moreover, it must be noted that the use of the term "whistleblower" by Dr. Wilson and her committee is not only inappropriate, but chilling - especially given the fact that UWM's allegation of "professional misconduct" or "professional misrepresentation" is not affiliated in any way to UWM.

During the "investigation interview," I specifically asked Dr. Wilson, what UWM policy I stood accused of violating and what laws I allegedly obstructed - Dr. Wilson identified none. In fact, Dr. Wilson and her committee conceded that there is "no prescribed policy" on "professional misconduct" or "professional misrepresentation" (See Exhibit 9). Moreover, Dr. Wilson failed to articulate the University's definition of "professional misconduct" or "professional misrepresentation." Dr. Wilson also did not provide me with a definition of professor and the various rankings of the professoriate. Throughout the "investigation interview," I told Dr. Wilson that I felt uncomfortable with the entire "investigation" process and asked her repeatedly why I am being singled out.

It must be noted that age also played a major role in Dr. Wilson's determination. I am older than Dr. Wilson and she discounted with bias my protracted academic and professional experience. As such, Dr. Wilson and her committee determined that my "behavior" fell within UWS 17.9.11. This regulation pertains to those who have made "a false oral or written statement to an agent or employee of UWM regarding a university matter" or "refused to comply with a 'reasonable request' regarding a university matter" (See Exhibit 9). However, Dr. Wilson and her committee never indicated specifically what "false oral or written statement" that I made to "an agent or employee of UWM regarding a university matter" or in what manner have I refused to comply with a "reasonable request" regarding a university matter – what was the university matter and when did I refuse to comply?

As evidence of this vague "misconduct," UWM codified publicly available websites including articles published online and references about me on social media websites and used these websites/articles to create a "Patrick Delices' Misrepresentation File" (See Exhibit 10). Again, as part of my defense, I reminded Dr. Wilson that I cannot control third party websites and what they say – Dean Marija Gajdardziska-Josifovska of UWM wrote "I agree with your statements about web pages" (See Exhibit 8). Many of the websites list contradictory or slightly incorrect information – however, not one referenced me as a "Dr." or "professor" at UWM.

There are some websites where I am referred to as "professor." I taught undergraduate courses within the City University of New York, where schools such as Hunter College use the term "adjunct professor" to describe professors of a particular ranking within the professoriate. Third party sites often run with "Professor Delices" as outside academic circles, and particularly in urban environments with dense foreign born populations, where many people do not have the privilege of having multiple graduate and undergraduate degrees and university exposure to the American system where it is exceedingly common for members of the public to refer to anyone teaching at the collegiate level as "professor." As a matter of fact, within my national origin/racial cultural heritage, the Haitian Creole word for teacher (at any level) is *pwofesè* or *professeur* in French - the English translation is professor. Please note that Haitian Creole is my first language not English and my ancestors are from Haiti. As such, I have the cultural and linguistic characteristics of my family's national origin group from Haiti. In spite of these facts, with bias intent, I was unjustly labeled as "naïve" (See Exhibit 9) by Dr. Anika Wilson and her committee due to their discrimination and lack of consideration regarding my national origin/racial cultural heritage. Nonetheless, it is unreasonable to expect members of the general public to verse themselves in the intricacies of academic parlance, and in fact, dictionary definitions are being changed to reflect broad usage of the term professor. In no way does failure to chastise third parties for adopting this usage of professor equates to me, or any other current or former adjunct, holding out as having achieved a specific academic rank.

For clarification, before and during my time at UWM, I submitted written articles to the *New York Amsterdam News, Black Star News,* and other publications. Most of my writings deal with Black politics, race, systemic reformation, systemic oppression, and economic, political, and socio-cultural exploitation inside and outside the United States. During the "investigation interview," Dr. Wilson questioned me about my political affiliation and social relationship with various media outlets and political organizations such as the *Final Call, Nation of Islam, Institute of the Black World,* and *Legacy of 1804* – these particular organizations deal with economic, political, and cultural issues involving race, sex/gender, religion, racism, colonialism, and oppression. Thus, my politics on race, sex/gender, and religion in addition to my political association with certain racial political groups became a topic of conversation during "the interview."

I asked why my affiliation with these particular organizations was an issue in this "interview" as they and their representatives are not UWM officials. It is of note that my affiliation with any groups outside academia that didn't reference race and racial/sexual politics was not discussed. I expressed my discomfort to Dr. Wilson regarding "the interview" and "investigation" as the area of inquiry narrowed down to target my political affiliation with organizations that centered around racial and gender politics. To the point, I referenced myself to Dr. Wilson as being akin to the "Trayvon Martin" of UWM - unnecessarily targeted because of my race, gender, and age - subject to investigation by parties with no legitimate authority over me and my First Amendment and civil rights, and interest in my activities for precisely those reasons. Of note was the absence of inquiry regarding affiliations with any groups where race and sex/gender are not at issue, including past participation in alumni events and organizations at NYU-Stern and Columbia University.

It is also alleged that I "misrepresented" myself to obtain desk copies of a book in 2015. In terms of the desk copy, I informed Dr. Winkler via email that it was a misunderstanding - I gave the publisher Dr. Winkler's email in hopes of confirming the fact that I am a doctoral student and a former teacher's assistant at UWM in need of a book for research purposes.

In evaluating whether or not this "investigation" is resultant determination violates the Civil Rights Act, it is relevant that Dr. Wilson indicated (on paper, but not during the "investigation interview") that she "interviewed" Dr. Sommers. I vehemently reject the committee's assertion that Dr. Sommers "warned" me about "professional misrepresentation" or "professional misconduct" during the spring of 2015. As a matter of fact, the editor of Lexington Books referred to me as "Dr. Delices" in a contract letter to Dr. Sommers. (See Exhibit 11). Dr. Sommers did not correct the publisher, though here the University's interests are at issue since UWM is named in the publication.

The fact that I was "investigated" as a student for the same behavior exhibited by Dr. Sommers is clear evidence of differential treatment. It is egregious that this professor is also my advisor, and yet as the investigated student, I sit subject to disciplinary action determined in large part by UWM's reliance upon the unsubstantiated word of the same professor - had I been afforded a full hearing, I would have brought out the University's inconsistency. As such, the University does not hold Dr. Sommers accountable for failing to correct a publisher's erroneous declaration of me as "Dr." for a book clearly attributable to UWM – yet, holds me liable as a student for third party statements where UWM is not even mentioned. Moreover, it must be noted that Dr. Wilson and her committee never provided evidence where I "purposefully" and "professionally misrepresented" myself on my LinkedIn page - they and/or the "whistleblower" simply used social not professional media websites and third party online sources which are often unreliable and error-prone. As such, Dr. Wilson's role in this "investigation" is concerning because it is not clear if she is trained in investigatory procedures and/or discriminatory matters, especially given the fact that I had concerns about discrimination in addition to concerns about the "investigation" and "interview" process. I expressed these concerns to Drs. Wilson, Sommers, and McClure and they never referred me to UWM's Office of Equity/Diversity Services. As a matter of fact, Dr. McClure referred me to Dr. Sommers. The role of Dr. Wilson and her committee in addition to the role of Dr. Sommers would have reasonable dissuaded a student from complaining about discrimination. Therefore, the entire "investigation" and "interview" processes were not only arbitrary and capricious, but chilling and discriminatory. As such, the file and charge of "professional misrepresentation/misconduct" should be abrogated.

Immediately after being accused (falsely, unjustly, and without due process) of "professional misrepresentation/misconduct" on November 24, 2015, my request for the renewal of my AOP fellowship was denied for 2016-2017 by my doctoral advisor, Dr. Jeffrey Sommers (See Exhibit 7). Moreover, after the denial of my AOP fellowship, Dr. Sommers who also chaired the committee for my preliminary examination failed me on this exam (See Exhibit 3), even though in 2014-2015 Dr. Sommers secured my expertise and assistance in completing a book on Haiti, the country of my ancestral origin. However, this discrimination manifested during the summer of 2015 after I submitted to Dr. Sommers my website and curriculum vitae which allowed the Department of Africology to deny me of my AOP fellowship and create a discriminatory profile on me.

Moreover, after the summer of 2015, when the book (*Race, Reality, and Realpolitik: U.S.-Haiti Relations in the Lead Up to the 1915 Occupation*) was set for a November 2015 publication date, Dr. Sommers abruptly and unfairly altered the topic of my preliminary exam which was strictly on Haiti (See Exhibit 1) to the theories of imperialism (See Exhibit 2). I disagreed with this sudden change and voiced my concern to Dr. Sommers regarding this sudden change, but he insisted that I focus on the theories of imperialism. As a result, unlike other doctoral students in the Department of Africology, the disparate treatment is illustrated by the fact that I had two bibliographies: one on Haiti and the other on imperialism. Dr. Sommers kept changing the bibliographies as late as December of 2015 – I was scheduled to take the preliminary exam on January 4, 2016 with a reading list of over 100 books. It must be noted that I requested repeatedly to take the preliminary exam since the spring/summer of 2015 and at that time, only one bibliography existed for the main topic of agreement which was on Haiti not the theories of imperialism.

Nonetheless, I never received a detail academic rubric and evaluation (grading system or grade scale) of my academic performance on this exam (See Exhibit 3). Furthermore, I never received feedback on my exam performance from the other committee members: Dr. George Bargainer and Dr. Harwood McClerking (See Exhibit 3). The "grading process" for this exam is unusual and the feedback from Dr. Sommers is questionable given the fact that the exam question that he designed did not mention theories of economic development as a specific topic to be explored; yet, Dr. Sommers oddly and unfairly based his evaluation of my exam performance on theories of economic development and imperialism, but not Haiti (See Exhibit 3). Therefore, given these discrepancies and differential treatment, this preliminary exam should be considered passing by default.

Being treated differently (unfairly and unequally) by the Department of Africology due to my race, national origin, age, and sex/gender degrades not only me, but UWM. It also has the potential to permanently damage my academic and professional career while placing me at a disadvantage economically within a competitive global market (See Exhibit 12). My complaints are serious and these discriminatory factors have had an adverse and chilling impact on my personal, professional, and academic life.

To resolve this unfortunate situation, I am seeking the following:

- An apology from the Chancellor's Office at UWM regarding discriminatory treatment and false allegations of "professional misrepresentation/misconduct."

- Renewal of my AOP fellowship for 2016-2017 and 2017-2018.

- Overturn the preliminary exam and deemed it as passing by default.

- Expunge the file and charge of "professional misrepresentation/misconduct" where my name is clear of false allegations, such as "professional misconduct" and "professional misrepresentation."

- Equal compensation and proper recognition as a co-author to *Race, Reality, and Realpolitik: U.S.-Haiti Relations in the Lead Up to the 1915 Occupation* published by Lexington Books. It must be noted due to the racialized power-based positionality, Dr. Sommers abused his power and authority by listing me as a contributor not as a co-author as he promised when we initially started the book project in 2014. Moreover, Dr. Sommers changed the terms of remuneration abruptly as the book was set for publication. It must be noted that I participated in the book project due to the control, influence, and decision-making power Dr. Sommers exercised as a faculty member and my doctoral advisor.

- Disclose the "whistleblower" and recuse the "whistleblower" if he or she is internal to the Department of Afrciology or affiliated with UWM from any activity related to my doctoral degree track and academic/professional pursuits.

- Secure a doctoral advisor in addition to a dissertation committee that has my best academic and professional interest at heart.

- Affirmatively secure unbiased academic and professional references and recommendations from faculty members at the Department of Africology.

- Safeguard non-retaliatory behavior and action by UWM and the Department of Africology.

- Guarantee my successfully progress and completion of the doctoral program in africology at UWM. If not, secure my transfer to another department (preferably Political Science or History) at UWM or an UW affiliated school.

- Consider compensation for the unequal opportunity to teach in addition to other forms of discriminatory conduct.

By exercising discrimination, the conduct of UWM's Department of Africology impairs and tarnishes the traditional mission and historical, political, and cultural integrity of Black Studies departments throughout the nation which were founded to overcome discrimination, eradicate unequal treatment, and promote tolerance in spite of one's race, national origin, sex/gender, age, and political/cultural views. As such, given the spirit of your office and this nation, it is my sincere hope that my complaints can be resolved in an amicable and auspicious manner. I look forward to your response and resolution.

1

# EXHIBIT 1

from: **Jeffrey W Sommers** <sommerjw@uwm.edu>
to: Patrick Delices <pdelices@gmail.com>
date: Sun, Jun 28, 2015 at 1:36 PM
subject: prelim
mailed-by: uwm.edu
: Important mainly because of the people in the conversation.

Hi Patrick,

Below is the question I have drafted for your prelim exam. Have shown PBS, who much likes it. Have to yet see if your committee will be fine with it, which I think will work.

Question:

Provide a political economy (inter/trans-disciplinary) analysis of "Haiti's" signal experiences from its encounter with Columbus, to its incorporation as France's colony of Saint Domingue, to its liberation from France as Haiti. Continue your analysis by charting the transformative events in Haiti's development up to the present. Your answer must place this history in the context of forces global, regional and local in character. In particular, pay close heed to asymmetries in power. Detail big to small state relations, but just as significantly class relations as economic and social structures evolve and shift on both local and national levels. Race must also central factor into your analysis.

Your work must display an analysis that is both comprehensive in its coverage of the chief theoretical paradigms for explaining the forces above. You must also detail the strengths and weaknesses of the 'schools of thought' (debates) referenced. Ensure you display a command of the material from preliminary exam reading list, but while also being able to expand beyond it.
Expect to write some 7-10k words on this question.

Take care,

Jeff

from: **Patrick Delices**
    &lt;pdelices@gmail.com&gt;
  to: Jeffrey W Sommers
    &lt;sommerjw@uwm.edu&gt;
  date: Sun, Jun 28, 2015 at 2:37 PM
 subject: Re: prelim
mailed-by: gmail.com
    : Important according to our magic
     sauce.

Great!

So, when should I get started? And what is the deadline for completion / submission?

As always, thank-you!

Hope all is well.

Best,

PD

Sent from my iPad


On Jun 28, 2015, at 2:50 PM, Jeffrey W Sommers &lt;sommerjw@uwm.edu&gt; wrote:

Start preparing rigt now. Will try get answers for you in the rest upon my return. Take care,
Jeff


From: Patrick Delices &lt;pdelices@gmail.com&gt;
Date: Sunday, June 28, 2015
Subject: prelim
To: Jeffrey W Sommers &lt;sommerjw@uwm.edu&gt;

Understood!

PD

Sent from my iPhone

On Jun 28, 2015, at 3:51 PM, Jeffrey W Sommers &lt;sommerjw@uwm.edu&gt; wrote:

Hi Patrick, this will really require a full-out effort all summer to complete by the end of August. I designed the question in a way so that you can also get an article out of it or a chapter for your dissertation. But, the bar is high here. You can do it, but will take much, much reading.

On Jun 28, 2015, at 10:25 PM, Patrick Delices <pdelices@gmail.com> wrote:

Understood.

Thanks again.

PD

Sent from my iPad

# EXHIBIT 2

From: Jeffrey W Sommers
Sent: Monday, January 04, 2016 5:15:37 PM
To: Patrick Delices
Subject: Delices Prelim Exam

Hi Patrick,

Please find your prelim question below. Please confirm receipt of this email.

Regards,

Jeff

Prelim Question for Patrick Delices (2016)
Provide a political economy of Haiti's history, from French colony to present. Your essay should detail both specific events of central importance and long run processes through the prism of theories of imperialism.
Rather than focus on one theoretical framework of imperialism, specify how Haiti's history (again, both specific events and long-run processes) would be interpreted through the respective approaches of theoreticians on your imperialism reading list. Your essay must avoid generalities and engage specifics. It must demonstrate a command of Haiti's history and an ability to compare and contrast different theoretical approaches for explaining it. Your essay must also be informed by local, regional, hemispheric and global imperatives in play at different points in time and how they acted upon Haiti. Also referencing how these extra-Haitian imperatives were in part a reaction to events in Haiti.
While your exam should demonstrate command of the exam reading lists, it should also provide a synthesis of them, where the sum is greater than its constituent parts.
Your essay must be 6k (minimum) words long, while striving to not exceed this word length.
It has been emailed to you on January 4th and must be returned by the end of January 11th.
Prelim Committee Members:

Jeffrey Sommers
Harwood Mcclerking
George Bargainer

# EXHIBIT 3

From: Jeffrey W Sommers
Sent: Sunday, January 31, 2016 2:36:09 PM
To: Patrick Delices
Cc: george bargainer; Harwood K Mcclerking; Anika Wilson; Erin N Winkler
Subject: prelim exam

Dear Patrick,

I am returning your prelim exam with comments included (see margin comments and tracking at end). I was waiting for Dr. Bargainer to send written comments, but they have not arrived yet. Dr. McClerking merely said he agreed with my comments in full. As I referenced in our phone call it was the view of all three committee members that the prelim exam was not passing.

Passing this prelim exam will take much work (reading or re-reading) in order to better see the intersection between Haiti's development through the prism of theories of economic development and imperialism. I have to be honest and state that it will be a steep climb to gain mastery, or even general competence, of these topics.

Please confirm receipt of this email.

Regards,

Jeff

Exhibit #4



UNIVERSITY of WISCONSIN
UWMILWAUKEE                    Graduate School

Mitchell Hall
P.O. Box 340
Milwaukee, WI
53201-0340
www.graduateschool.uwm.edu

August 19, 2015

Patrick Delices
948 Longwood Avenue
Bronx, NY 10459-5007

Dear Mr. Delices,

As an Advanced Opportunity Program (AOP) award recipient at the University of Wisconsin Milwaukee, you accepted a requirement to limit your outside employment to a maximum of 10 hours per week. This requirement is meant to support the success of promising students by ensuring that their attentions are fully devoted to their graduate studies. It has been brought to our attention, however, that concurrent with the period of your AOP award, you have been employed as the "Senior VP of Administration" at an organization called the "4T's—Teaching Teens to Think" in New York City. As of today's date, you are listed in this capacity on the organization's website, http://www.4ts.org/patrick-delices.html.

Although you told us that your position was that of a volunteer, we received conflicting information in a recently conducted employment verification with the 4T's organization. Information obtained in that verification indicates that your position is paid, full-time, and year-round; that it requires at least 40 hours per week on an ongoing basis throughout the academic year, and that you continue to be employed in this capacity. In your signed AOP acceptance form dated March 17, 2014, and renewed on March 21, 2015, it states that failure to comply with AOP award regulations, including concurrent employment limits, may result in the cancellation of your fellowship. Given the information above, I am suspending your award renewal for academic year 2015-16, effective immediately. Unless you can provide satisfactory information substantiating that you did not work greater than 10 hours per week within ten working days of the date of this notification, your forthcoming award will be cancelled permanently. I am also considering proceedings to pursue repayment of AOP monies awarded to you in the 2014-15 academic year.

You are welcome to contact me in writing at the mailing address above with any evidence you can provide in support of your case. You are also welcome to make an appointment to present evidence and explanations directly in person. If you wish to make an appointment, please contact Ellen Kowalcyzk, Executive Assistant to the Dean of the Graduate School, via email, kowalczy@uwm.edu, or phone, 414-229-2937.

Sincerely,

Marija Gajdardziska-Josifovska
Dean of the Graduate School

Cc: Erin Winkler, Chair of Africology
    Tracey Heatherington, Associate Dean of Graduate School
    Wendy Labinski, Assistant Dean of Graduate School

Exhibit #5

948 Longwood Avenue
Bronx, New York 10459

August 27, 2015

Marija Gajdardziska-Josifovska
Dean of Graduate School
University of Wisconsin Milwaukee
Office: Mitchell Hall 251
P.O. Box 340
Milwaukee, WI 53201-0340

Dear Dean Gajdardziska-Josifovska:

As a private U.S. citizen and a promising doctoral student at the University of Wisconsin-Milwaukee (UWM), I understand how public information on the Internet could be misleading and misread. Public information on the Internet regarding a profile of a private citizen is customarily outdated, inaccurate, ambiguous, or misinterpreted. Nonetheless, it is my hope that this correspondence along with supporting documentation can clear up any misunderstanding or confusion that seems to have manifested regarding an employment status that does not exist at my end. Thus, with unequivocal assurance, I strongly and wholeheartedly repudiate the allegation that I am a paid full-time employee of Teaching Teens To Think (4T's) while being an Advanced Opportunity Program (AOP) award recipient at UWM.

As an AOP award recipient, I made a commitment to limit any outside employment to a maximum of 10 hours per week. From 2014-2015, I have maintained my AOP commitment to the point that I have not been a paid employee of any company for any amount of hours per week. It is alleged that I am employed at 4T's as the Senior Vice President of Administration. The truth of the matter is that I am not employed in any capacity with 4T's - I am only listed on its website which in no way clearly indicates nor directly states that I am a full-time or part-time paid employee. It must be noted that prior to my arrival at UWM in 2013, I served as a volunteer for 4T's. During my tenure at UWM, I never worked for 4T's - not even for 10 hours per week.

Being listed on someone's website and being actually employed are totally two different matters given that fact that the website of 4T's listed me (in the present tense) as holding the position of Director of Career Planning at Dominican College. My professional profile on this particular website is simply behindhand given the fact that I have not worked for Dominican College as a full-time paid employee since 2010. Therefore, it is humanly impossible for me to work for 4T's in New York, New York for at least 40 hours per week and simultaneously work for Dominican College in Orangeburg, New York for at least 40 hours per week and attend UWM in Milwaukee, Wisconsin as a doctoral student. Accordingly, in 2014, I was compensated for unemployment by the New York State Department of Labor.

To substantiate my claim, I have enclosed the New York State Department of Labor Form 1099-G along with a notarized letter from Mr. Kayode Bentley, founder and president of 4T's. The New York State Department of Labor Form 1099-G confirms my unemployment status in 2014 as I did not work for 4T's while being a recipient of the AOP award. Moreover, the letter from Mr. Bentley verifies the fact that I never worked for 4T's during my tenure as an AOP award recipient. If you need additional documentation to support my claim, I can provide to you at a later date a transcript of my 1040A U.S. Income Tax Return for 2014, which is not readily available at the time of this correspondence.

I am grateful for the AOP award and I would not jeopardize such a wonderful funding opportunity. Since 2014, as an AOP award recipient, I have been aboveboard and in compliance with the AOP award regulations. Therefore, given this unfortunate misunderstanding, I am requesting that my AOP fellowship be restored. It is my sincere hope that this unfortunate misunderstanding does not impair my good name at UWM along with my chances of obtaining succeeding awards or honors from UWM. It is also my sincere hope that this unfortunate misunderstanding does not have an adverse effect and reflect negatively on UWM's Department of Africology and its students. Moreover, it is my sincere hope that this matter can be resolved expeditiously as I am anticipating a favorable resolution so I can move forward not only as a promising doctoral student, but as productive private citizen of the world.

Sincerely,

Patrick Delices
Doctoral Student
University of Wisconsin-Milwaukee

Enclosures:

      Encl. 1 - New York State Department of Labor Form 1099-G
      Encl. 2 - Mr. Bentley's Letter

Cc:    Erin Winkler, Chair of Africology
       Tracey Heatherington, Associate Dean of Graduate School
       Wendy S Labinski, Assistant Dean of Graduate School

NEW YORK STATE DEPARTMENT OF LABOR
PAYMENT UNIT, BUILDING 12 1099-G
PO BOX 621
ALBANY, NY 12201-0621

Do You Qualify For An Earned Income
Credit?

You may be entitled to a Federal tax credit. The amount
of the credit is based on your earned income such as
wages and self-employment. This credit may be allowed
even if you do not owe any Federal income tax.
However, you must file a Federal income tax return to
obtain the credit. See the instructions on your Federal
income tax forms to determine if the amount of your
income allows you to claim this credit.

## Important Information About Form 1099-G

Because you received unemployment compensation payments of $10 or more
in 2014, New York State is required to report those payments to the Internal
Revenue Service, and give you Form 1099-G by February 2, 2015.
Unemployment compensation payments include:

- Unemployment Insurance payments
- Extended Benefits and Federal Supplemental Compensation payments
- TAA (Trade Adjustment Aid) basic, retraction, and additional training
  payments
- DUA (Disaster Unemployment Assistance) payments

Please keep Form 1099-G for your records. You will need this information to
complete your Federal, State and Local income tax returns. If you did not
receive any unemployment compensation this year, but received an
overpayment, this form is being sent to assist it will be of help to you.

Note: Unless you have voluntarily authorized Federal or State withholding,
Federal, State and Local income taxes are not withheld on unemployment
compensation. If you expect to receive these benefits in the future, you can
ask the Department to withhold Federal and State income tax from each
payment. Or, you can make estimated tax payments during the year. For
more information regarding how to make estimated tax payments, see
instructions on the Federal income tax return, or contact the Internal Revenue
Service or the NYS Department of Taxation and Finance.

If this 1099-G is for a year earlier than 2014, see the instructions on the
appropriate tax return, or contact the Internal Revenue Service, the
NYS Department of Taxation and Finance or your local taxing authority
to determine the amount of taxable unemployment insurance.

BOX 2 Shows adjustments credited to you this year. Adjustments
include money we received including cash (money orders and personal
checks) and offsets of income tax refunds or repayment of an
overpayment. Current unemployment compensation, used to repay
(offset) existing overpayments, is not included in this amount. Adjustment
information may be helpful to you in filing your return.

BOX 4 Shows Federal income tax withheld from your unemployment
compensation paid to you this year. If you voluntarily authorized
withholding, the tax has been withheld at a 10% rate. Include this amount
on your income tax return as tax withheld.

BOX 5 Shows reemployment trade adjustment assistance (RTAA)
payments you received. The amounts are not included in the Box 1 total.
Include on Form 1040 on the "Other income" line. See the Form 1040
instructions.

BOX 10a Shows the payer's state.
BOX 10b Shows the payer's Federal identification Number.
BOX 11 Shows total State income tax withheld from unemployment
compensation paid to you this year. If you voluntarily authorized
withholding, the tax has been withheld at a 2.5% rate. Include tax withheld,
if any, on your income tax return.

Future developments. For the latest information about developments
related to Form 1099-G and its instructions, such as legislation enacted
after they were published, go to www.irs.gov/form1099.

PAYER'S name, street address, city, state, ZIP code, Federal identification number, and telephone number

NEW YORK STATE
DEPARTMENT OF LABOR-UNEMPLOYMENT INSURANCE
ALBANY, N.Y. 12240-0001

PAYER'S Fed. Id. No.27-6293117          Phone 518 485-7071

| PAYER'S Fed. Id. No.27-6293117 | 1. Unemployment compensation | 2. Adjustments | OMB No. 1545-0120 | | Statement for Recipients of Certain Government Payments |
|---|---|---|---|---|---|
| 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 | $2,400.00 | $0.00 | | | |
| | 3. | | 4. Federal income tax withheld | | Form 1099-G (12/14) 2014 |
| | | | $0.00 | | |
| | 5. RTAA Payments | | | | |
| | $0.00 | | | | |
| | 7. | 8. | 9. | | |
| | 10 a. | 10 b. State identification No. | 11. State income tax withheld | | |
| | State | NY 27-6293117 | $0.00 | | |

RECIPIENT'S identification number

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

RECIPIENT'S name, street address, city, state, ZIP code

P DELICES
948 LONGWOOD AVE
BRONX

P
DELICES
948 LONGWOOD AVE
BRONX                NY 10459-5007

This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other
sanction must be imposed on you if this income is taxable and the IRS determines that it has not been reported.



# 4T'S PRODUCTIONS
## Teaching Teens To Think

August 25, 2015

To Whom This May Concern,

As the founder and president of 4T's (Teaching Teens To Think), I am verifying that from 2013 to the present, Mr. Patrick Delices has not been employed as a full time or part time hourly, weekly, bi-weekly, monthly, or yearly paid employee with 4T's.

Prior to 2013, Mr. Delices only served as a volunteer to my organization and after 2013, he has not been active at 4T's Productions given the fact that since 2013, Mr. Delices has been heavily engage in graduate studies, academic research, and study abroad activities. In knowing and understanding that Mr. Delices' commitment is elsewhere and that his time is limited, on extremely rare occasions, I would contact Mr. Delices for his advice or testimonials.

As evidence of Mr. Delices not being a full-time paid employee, please review the company's financial statement for 2014 which can be found on 4T's website at http://4ts.org/reportsfinances.html. As you will see, the company's financial statement for 2014 clearly indicates that the Senior Vice President title like all the other titles is an unpaid position within 4T's Productions.

Mr. Delices' profile does appear on the 4T's website because our website has not been updated due to lack of resources as the company is currently seek a webmaster to make the necessary updates on 4T's website. In addition, my organization is seeking to fill the void of the Senior Vice President post as I have yet to find a suitable replacement that can offer his of her services on a volunteer basis. Mr. Delices' profile is on the 4T's website for cosmetic and marketing purposes until we can find a replacement and properly update the company's website.

I express regret for not updating 4T's website and hopefully, Mr. Delices' profile on 4T's website has not given you the wrong impression of Mr. Delices as I find him to be a man of great integrity and promise. With that said, please feel free to contact me at kbentley@4ts.org if you have any questions regarding Mr. Delices' character and professionalism.

Kayode Bentley
President/Founder
Teaching Teens To Think (4T's) Productions

8/27/15

ALVIN NUNEZ
Notary Public, State of New York
Qualified in Bronx County
No. 01NU6293321
My Commission Expires 12/09/2017

590 MADISON AVENUE, 21ST FL • NEW YORK, NY • 10022
PHONE: (212) 521-4132 • FAX: (212) 521-4099
WEBSITE: www.4ts.org

Exhibit #6



UNIVERSITY of WISCONSIN

**UWMILWAUKEE**

Graduate School

*Office of the Dean*

Mitchell Hall 251
P.O. Box 340
Milwaukee, WI
53201-0340
www.graduateschool.uwm.ed

September 2, 2015

Dear Mr. Delices,

We have received your letter and documents submitted on August 27, 2015, and appreciate your willingness to assist us in clarifying your employment status in relation to your current Advanced Opportunity Program (AOP) fellowship award. Your letter states that you have been consistently aware and respectful of the terms of the award, including the requirement to limit any outside employment to a maximum of 10 hours per week. It also offers an explanation for the apparent misunderstanding. In keeping with our faith that our fellowship recipients represent the very best of our institution, in terms of personal and academic integrity as well as academic promise, we are allowing you the benefit of the doubt in this matter. I am therefore reinstating your award renewal for the 2015-2016 year, effective immediately.

We nevertheless note that the evidence available for our assessment is not fully conclusive. Your response indicated that the public website, <http://4ts.org/patrick-delices.html>, listing your position of Senior Vice President of Administration in the 4Ts organization in New York was simply out of date and inaccurate. Please note that our concerns about your compliance with the requirements of the AOP award, specifically were based not merely on the information listed by that website, but also on information we received when we called the 4Ts organization to inquire by telephone. When our human resources specialist spoke with Mr. Bentley, President of the 4Ts organization, on July 22nd 2015, he made clear statements that you were currently (and continuously since 2008) employed in a full-time, year-round, paid position at 4Ts, that might often exceed 40 hours per week during the school year. It is indeed puzzling that the same Mr. Bentley has now provided us with a notarized statement, dated August 25, 2015, to the effect that you have never served in his organization in anything but a volunteer capacity, and have not been active in 4Ts since 2013. Mr. Bentley has supplied conflicting statements.

We acknowledge that the 4Ts 2014 financial statement posted on the organization's website (http://4ts.org/reportsfinances.html) appears to support your explanation that you have worked only as a volunteer for 4Ts. However, as you yourself point out, that website contains a number of